156

## A. M. JOHNSON, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61345.   Promulgated February 26, 1935. .

*Maxwell A. O'Brien, Esq.*, and *Pressly R. Baldridge, Esq.*, for the petitioner.

*J. R. Johnston, Esq.*, and *T. M. Mather, Esq.*, for the respondent.

160

## OPINION.

VAN FOSSAN: The first issue for disposition is that of estoppel, raised by the respondent. The respondent, by amendment to his answer, alleges various facts as to petitioner's conduct, specifically, that he originally reported all of said sum of $450,000 as his income; that in his petition as originally filed, he made no claim that the whole thereof was not taxable to him; that thereafter in an amended petition, and after the statute of limitations had run against the right of the Commissioner to assess additional sums against petitioner's wife and sister, he, for the first time, asserted that he was not taxable on all of the sum of $450,000; wherefore, respondent claims petitioner is, and should be, estopped from now denying that said sum was all income to him for the year 1929.

We thus face the question whether the respondent's proof established the estoppel so pleaded. It is elemental that to establish an estoppel there must be a misleading. The party claiming estoppel must have been misled into altering his position to his injury. Such facts must appear in the proof. Likewise, it is fundamental that the doctrine of equitable estoppel is essentially that of " good conscience." Therefore, where one with convenient opportunity to ascertain the real facts by the exercise of reasonable diligence neglects to do so, he will not be permitted to defeat another's just rights by urging an equitable estoppel upon his having acted to his disadvantage or having failed to act to his advantage in reliance upon the other's innocently mistaken representation regarding those facts, such representation not having been made for the purpose of inducing him so to act.

Here we fail to find in the record any proof that petitioner made any intentional misrepresentation intended to cause the Commis-

sioner to alter his position or to lull him into inaction. Moreover, the proof does not establish that respondent was without opportunity to ascertain the real facts before the statute of limitations had run against him. In fact, there is evidence showing that a complete disclosure of the respective holdings was made in reports to the Commissioner and in conferences with his representatives. Furthermore, the books reflected the ownership and were made available to the Commissioner's agents. Again, we are uninformed of any change in the Commissioner's conduct brought about by the alleged misrepresentation or of any injury caused him. In short, we are of the opinion that the facts adduced fail to establish a basis for applying the doctrine of estoppel. See *Northport Shores, Inc.*, 31 B. T. A. 1013.

The next question for decision is whether or not the $450,000 received as liquidated damages for the failure by Chapman Co. to carry out the contract of purchase of stock was ordinary income or was a capital gain.

The petitioner proceeds on the theory that the payments of $90,000 and $360,000 were made pursuant to the terms of a contract of sale of the company stock and, hence, related to the disposition of a capital asset held for more than two years. The petitioner's theory is based on a false premise. The payment was made not because of the disposition of a capital asset. It was a payment of liquidated damages for failure to complete a sale.

After the payment the petitioner had exactly the same capital assets as before the transaction was entered into. The entire transaction took place during the taxable year of 1929. Consequently, there is no basis for contending that the $450,000 income arose from the disposition of a capital asset. The income was ordinary income, taxable at the prescribed rates.

Having determined that the $450,000 received by the petitioner as liquidated damages constituted income taxable at ordinary rates, we must determine to whom such income is taxable. The respondent has held that the entire amount is taxable to the petitioner. In this we find him to be wrong. The evidence unmistakably shows that during the year 1929 and for many years before, the petitioner owned only 36.33+ percent of 90 percent (or 32.7 percent of the whole) of the outstanding capital stock of the National Life Insurance Co. of the United States of America. He had held the record title to the stock owned by his sister only in order to facilitate any possible transaction therein required to be made during her absence. His wife held the certificates to her own stock. He was the manager of the business affairs of all of them and had acted as such for many years. Though all dividends from the stock due to his sister and

himself were paid to him, they were in amounts based on the stock owned by them and in items corresponding to the real stock ownership, issued in his name, but in blocks of certificates segregated according to actual ownership. The dividends from stock owned by petitioner's wife were paid directly to her. The proof leaves no doubt as to the real ownership of the stock.

Similarly, we conclude that though the contract, the breach of which gave rise to the income in question, was negotiated by petitioner and signed in his own name, in this, as in other transactions, he was acting as a trustee or agent for his wife and sister, as well as for himself. That the stock was actually owned by the three persons in approximately equal amounts, though title to the sister's stock stood in petitioner's name, is clearly established. At all material times the stock belonging to petitioner's wife stood in her own name and was so listed in the notice to the escrowee. That all business affairs of the three were handled by petitioner is likewise clear. The proceeds from the Chapman transaction, i. e., the $450,000, were credited to the joint account of petitioner and his wife and the separate account of the sister in proportion to their stock ownership, and subsequently invested in the rayon plant, the stock of which was later issued in amounts corresponding to the three several interests in the National Life Insurance Co.

The practice of the family group by which all business affairs of the family generally were carried on in petitioner's name was a long established custom. The Chapman transaction was no exception. When he entered into the contract agreeing to sell the stock he was acting for and on behalf of his wife and sister as well as for himself. It follows that the $450,000 was received in this capacity and that only $163,500 of such sum was income to him.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

SEAWELL, dissenting: I disagree with the conclusion reached in the foregoing case and with at least one statement of fact appearing therein. This statement of fact, which is the basis of the opinion, is indicated by the underscoring in the two excerpts copied as follows: " The proof leaves no doubt as to the real ownership of the stock. Similarly, we conclude that though the contract, the breach of which gave rise to the income in question, was negotiated by petitioner and signed in his own name, in this, as in other transactions, *he was acting as a trustee or agent for his wife and sister*, as well as for himself." and " when he [petitioner] entered into the contract [with

P. W. Chapman & Co.] agreeing to sell the stock *he was acting for and on behalf of his wife and sister* as well as for himself."

A thorough perusal of the record will disclose no word of evidence to sustain the statements underscored, and there was no stipulation of any fact. Neither the wife nor the sister was a witness and although the petitioner was sworn and examined in his own behalf, his counsel, purposely or otherwise, failed to ask him any question tending to elicit any such testimony and petitioner volunteered none. No writing or oral evidence was produced for the purpose of showing that the wife or sister ever attempted in any way to constitute petitioner a " trustee " or " agent " for either of them in this transaction or any transaction looking to the sale of this or any other stock owned by them or either of them; and there was no evidence that the wife or sister ever knew the contract " which gave rise to the income in question " was executed or contemplated until after the forfeiture and payment of the " liquidated damages " to petitioner.

Apparently the ownership of the stock placed with the escrow agent has been permitted to determine the ownership of the " liquidated damages ", although the contract was not for the sale of that particular stock, but any which petitioner might obtain.

Petitioner filed his income tax return, swearing that the $450,000 was his individual income (which was certainly not in conflict with the clear meaning and purport of the contract itself). The returns of petitioner's wife and sister, made out at practically the same time and apparently under the supervision of petitioner, included no part of that sum as income to either of them. Ordinarily it would require strong evidence to overcome the plain, direct, and unequivocal statement under the three income tax returns and the subscribed oaths of the three interested persons. No mere conjecture arising from some remotely related circumstance would suffice.

Respondent had a right to rely and did rely, he says, upon the tax returns. Petitioner himself so relied and filed his petition before the Board based on that reliance and continued to so rely until the statute of limitations had run in favor of the wife and sister, and then he changed front for his own advantage and to the disadvantage of the Commissioner. The Board and the courts have frequently said such change of attitude under such circumstances and with such a result will not be permitted.

BLACK agrees with this dissent.