*Decision will be entered for the petitioner.*

HAROLD S. SMITH AND LOIS M. SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RAYMOND A. SMITH AND OLGA SMITH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5673-64, 5926-64. Filed May 13, 1968.

*Valenine Brookes* and *Paul E. Anderson,* for the petitioners.
*James E. Merritt,* for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax for the calendar year 1957 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 5673-64 | Harold S. Smith and Lois M. Smith | $32,131.00 |
| 5926-64 | Raymond A. Smith and Olga Smith | 30,782.37 |

The sole issue for decision is whether certain amounts received by Harold S. Smith and Raymond A. Smith in 1957 are taxable as capital gains or as ordinary income.

### FINDINGS OF FACT

The stipulations of facts and exhibits attached thereto are incorporated herein by this reference.

---

Harold S. Smith and Lois M. Smith were husband and wife during 1957 and resided in Reno, Nev., at the time the petition herein was filed. They filed a joint Federal income tax return for 1957 with the district director of internal revenue at Reno.

Raymond A. Smith and Olga Smith were husband and wife during 1957 and resided in Reno at the time the petition herein was filed. They filed a joint Federal income tax return for 1957 with the district director of internal revenue at Reno.

Harolds Club was a Nevada corporation engaged in the business of operating a casino in Reno, where gambling is legal. In 1956 the stock of Harolds Club was held by Harold S. Smith, Raymond A. Smith, and Dorothy M. Smith (former wife of Harold), each owning 50,000 shares. Harold and Raymond A. Smith had held their stock since 1946. Their basis in this stock was zero.

Raymond I. Smith, father of Harold and Raymond A., was general manager of the club. He was owner of all the stock, 50,000 shares, of Raymond I. Smith, Inc., a Nevada corporation, which operated various bars connected with the club.

St. Charles Building Co., a Nevada corporation, in 1956 was owner of certain real property in Reno. Raymond A. Smith was president of this corporation.

Harold S. Smith, Raymond A. Smith, Dorothy M. Smith, and Raymond I. Smith are sometimes hereinafter referred to as the Smiths.

On February 29, 1956, the Smiths and St. Charles Building Co., as sellers, entered into a contract with Jules J. Agostini, Jr., as buyer, for the sale to the buyer of all the stock of Harolds Club and of Raymond I. Smith, Inc., and of certain real property. The price stated was $9,500,000, payable $500,000 immediately to an escrow holder and the balance on or before April 30, 1956. The deposit of $500,000 was made. The contract included a provision that no disclosure of the sale would be made unless the statement was agreed upon by the parties. A Reno newspaper of March 2, 1956, reported that the sale of the club was announced in a joint statement issued by Agostini and Raymond I. Smith.

The time for full payment as originally required by the contract of February 29, 1956, was extended on the same date to May 29, 1956, and on May 24, 1956, was again extended to September 29, 1956. On May 28, 1956, Agostini, with consent of the sellers, assigned to H.H.B., Inc., a Nevada corporation, his rights and interests in the contract and the deposit in escrow.

On June 25, 1956, the Smiths and St. Charles Building Co., as sellers, executed an amended contract with H.H.B., Inc., as buyer, which provided:

Whereas, BUYER and SELLERS mutually agree that the contract heretofore executed, dated the 29th day of February, 1956, between JULES J. AGOSTINI, JR., as BUYER, and the SELLERS herein designated as "SELLERS", is hereby cancelled, annulled and set aside, together with the escrow instructions based thereon, and that this agreement is substituted in full for the above and foregoing described contract;

Now, Therefore, the SELLERS, for the considerations hereinafter recited, have agreed to sell and deliver, and the BUYER has agreed to purchase from the SELLERS, at the price, and upon the terms hereinafter mentioned, ONE HUNDRED FIFTY THOUSAND SHARES (150,000) of the capital stock of HAROLDS CLUB, a corporation, being all of the issued and outstanding stock of said corporation, and FIFTY THOUSAND SHARES (50,000) of the capital stock of RAYMOND I. SMITH, INC., a corporation, being all of the issued and outstanding stock of said corporation, together with the following described parcel of land * * *

\*      \*      \*      \*      \*      \*      \*

Upon the Following Terms and Conditions:

FIRST: BUYER agrees to pay for said stock and real property, above described, the sum of TEN MILLION DOLLARS ($10,000,000.00), lawful money of the United States of America, payable as follows, to-wit: FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) to be paid by BUYER SIMULTANE-OUSLY with the execution of this agreement to the WASHOE TITLE INSUR-ANCE COMPANY, of Reno, Nevada, as escrow agent, to be applied on the purchase price, and the further sum of FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($5,500,000.00) to be paid by the BUYER in cash on or before the 29th day of September, 1956, at twelve o'clock noon. Said further payment to be made to WASHOE TITLE INSURANCE COMPANY, as escrow agent, for the account of SELLERS. Upon the payment of the said further sum, as aforesaid, on or before the 29th day of September, 1956, and by noon said day, the SELLERS agree to accept a promissory note for the balance of said purchase price in the sum of FOUR MILLION DOLLARS ($4,000,000.00), duly executed by the BUYER, said sum to be secured by a First Deed of Trust and Chattel Mortgage, executed by the BUYER, in favor of the SELLERS. * * *

\*      \*      \*      \*      \*      \*      \*

SECOND: The SELLERS agree, upon the payment to the escrow agent of the sum of FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($5,500,-000.00), on or before September 29, 1956, at noon of said day, and upon receiving notice of such payment, they shall immediately deposit with the escrow agent, subject to the terms hereof, certificate for ONE HUNDRED FIFTY THOUSAND (150,000) shares of the capital stock of HAROLDS CLUB, a corporation, and FIFTY THOUSAND (50,000) shares of the capital stock of RAYMOND I. SMITH, INC., a corporation, properly endorsed in blank, together with resig-nations of the present officers and directors of HAROLDS CLUB, a corporation, and RAYMOND I. SMITH, INC., a corporation, to become effective at the pleasure of BUYER. * * *

\*      \*      \*      \*      \*      \*      \*

THIRD: If the BUYER shall fail to pay and deposit the balance of the consideration with the escrow agent, to-wit, the sum of FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS ($5,500,000.00), on or before the 29th day of September, 1956, or should fail to dissolve HAROLDS CLUB, a corpora-

tion, and transfer all of its assets to BUYER, or to effect the retirement of the capital stock of RAYMOND I. SMITH, INC., a corporation, within the times hereinafter designated, or should fail to execute and deliver the promissory note for the balance due, securing the same with a Trust Deed, Chattel Mortgage and Pledge of stock of RAYMOND I. SMITH, INC., a corporation, within the time herein designated, or should fail to perform the other terms and provisions of this contract within the time designated, the escrow holder shall pay and deliver to the SELLERS the deposit of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), which deposit so made shall be retained by the SELLERS by way of liquidated damages for breach of contract on the part of the BUYER for failure to consummate said purchase, and the BUYER agrees that said amount represents damages accruing to SELLERS by reason of said breach of contract, and this agreement, and all of its provisions, shall terminate, and the contract shall no longer be of any force or effect, and all documents and instruments deposited by SELLERS with escrow agent, described in the "SECOND" paragraph hereof, shall be immediately returned to the SELLERS.

The contract further provided that the sellers should remain in possession of the business of the corporations until the terms of the purchase were complied with; that until the closing date the buyer, its agent or representative, should have the right to observe the business transactions of the sellers to determine the expenditures and receipts and assets and liabilities and all data connected with the operations; and that the business was to be carried on in the ordinary course, with the limitations that no dividends would be declared, no increase made in compensation of employees, bonuses would be limited to specified amounts, and no capital expenditure in excess of $5,000 would be made without consent of the buyer. It was also agreed that the buyer would employ Raymond I. Smith in an executive capacity, at a salary of $100,000 per year, for 1 year or until the promissory note was paid. Time was expressly stated to be of the essence of this contract.

The time for the payment of the additional $5,500,000 in cash and the execution and delivery of a note in the amount of $4 million, as required by the contract dated June 25, 1956, was later extended to 12 o'clock noon on October 15, 1956.

The buyer, H.H.B., Inc., failed to deposit the additional amount of the purchase price and note with the escrow agent on or before October 15, 1956, and, on that date, both the buyer and the sellers made demand upon the escrow agent for the $500,000 deposited.

On October 15, 1956, H.H.B., Inc., filed a complaint against the sellers in the Second Judicial District Court of the State of Nevada for the County of Washoe, docket No. 164,672. The buyer sought to recover the fund deposited in escrow, alleging certain defaults on the part of the sellers. The buyer also alleged that the contract was to provide security for damages which might be suffered by the sellers, that the damages suffered by them did not exceed $50,000, and that the

buyer was willing to pay that sum or any sum that would compensate them for actual damages.

On December 12, 1956, while the suit was pending, Ernest S. Brown, counsel for Agostini and H.H.B., Inc., submitted to M. A. Diskin, counsel for the sellers, an offer on behalf of Agostini to purchase the stock and other property involved for a total price of $9 million, with $5 million paid in cash including the deposit in escrow, and $4 million in installments over the next 5 years, Raymond I. Smith to be employed during the term and the suit to be dismissed. This offer was not accepted.

The Nevada District Court filed its opinion on August 16, 1957, and its judgment on September 3, 1957.

The court held that the sellers were entitled to receive the $500,000 deposit. The court's opinion stated, in part:

OPINION

Motions for summary judgment have been filed, argued and submitted for decision by both parties. While defendants urge that the contract under consideration should be construed and considered as an unilateral option contract in which event the earnest money deposit of $500,000 should be retained by them, it seems that this matter can be disposed of by a determination of whether or not the "THIRD" paragraph of plaintiff's Exhibit A should be construed to be a provision for liquidated damages or for a penalty.

*     *     *     *     *     *

The precise question raised by the cross motions for summary judgment (exclusive of the option theory) is whether Paragraph "Third" is a provision for liquidated damages or for a penalty. If it is to be construed as a liquidated damage provision then defendants are entitled to receive the $500,000 deposit. If it is a penalty then they must be put to their proof of damages as a result of the plaintiff's default.

*     *     *     *     *     *

I can only conclude that the sum of $500,000 was a good faith deposit on the purchase price, that the agreement was entered into fairly and without fraud or duress; and while I recognize that some courts believe that they should judge the sanity of ones' [sic] contractual actions, I believe that freedom of contract still has a certain serious place in our daily affairs.

Since it seems expedient for courts and lawyers to discuss doctrines and legal principles, reference is now made to certain matters which compel me to conclude that the damages which might result from a breach of contract were uncertain and incapable of reasonable ascertainment. What it would be worth to forego the right to declare dividends, the right to make necessary capital improvements, the right to forego the giving of bonuses to worthy employees, or the right to change the capital stock structure are all matters most difficult and incapable of ascertainment by courts, and to present proof would be most unsatisfactory. The fact that defendants' club could not be sold or offered for sale certainly is worth something, but proof of value would likewise be difficult. So when we take into consideration all the different factors which entered into the sale, and particularly the restrictions imposed upon defendants, I necessarily conclude that the parties

hereto attempted a genuine pre-estimate of the damages which might result if the defendants' property and management were restricted. The fact that it might now appear that such damages are disproportionate to the actual damage is no concern of ours.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Therefore, in accordance with this opinion, it is hereby ordered that defendants' motion for summary judgment is granted; that plaintiff's motion for summary judgment is denied.

H. H. B., Inc., filed a timely appeal to the Supreme Court of the State of Nevada from the opinion and judgment of the District Court entered in docket No. 164,672. Pending proceedings on appeal, the parties entered into a "Stipulation and Agreement" dated December 12, 1957, disposing of the litigation by settlement.

The stipulation recited that the plaintiff (the buyer) was in default for having failed to perform the terms of the contract, and that due to conflict in judicial determination of the issues on appeal and the likelihood that defendants would be called upon to prove the actual damages suffered, a settlement of the dispute was deemed advisable. The stipulation further recited:

defendants have represented and conclusively demonstrated to plaintiff that on a trial of this cause there is available to defendants substantial evidence, documentary and otherwise, to adequately support and establish, by a preponderance thereof, that defendants have, by reason of plaintiff's default and breach of said contract, suffered actual damages in a sum in excess of TWO HUNDRED NINETY THOUSAND DOLLARS ($290,000.00), and that the property of the defendants, the subject of said contract, has been and is damaged in excess of said sum.

The settlement resulted in the distribution of the $500,000 deposit in escrow as follows:

| | |
|---|---:|
| Washoe Title Insurance Co | $1,500 |
| H.H.B., Inc. | 209,250 |
| Sellers' legal fees | 34,250 |
| Raymond I. Smith | 63,750 |
| Raymond A. Smith | 63,750 |
| Harold S. Smith | 63,750 |
| Dorothy M. Smith | 63,750 |
| | 500,000 |

The gross gaming income and the slot-machine income (which is included in gaming income) as reported by the accountants for Harolds Club were:

| FYE | Gross gaming income | Slot-machine income |
|---|---|---|
| January 1, 1956 | $10,119,000 | $3,278,000 |
| December 30, 1956 | 10,633,000 | 3,033,000 |
| December 29, 1957 | 10,345,000 | 2,733,000 |

In 1959 Dorothy M. Smith sold her 50,000 shares of stock in the club to Raymond I. Smith for $2 million in cash.

The amounts received by Harold S. Smith and by Raymond A. Smith in 1957 from the foregoing distribution were received as liquidated damages resulting from the failure of H.H.B., Inc., to complete the contract of purchase, and are taxable to each of them as ordinary income.

## OPINION

The sole issue is whether the amount of $63,750 received in 1957 by Harold S. Smith and the same amount received by Raymond A. Smith are taxable as ordinary income or as capital gain. These amounts were received in settlement of litigation over the right to a sum deposited in escrow under a contract relating to the sale by the petitioners and others of certain stocks and real property, after the buyer failed to complete the purchase and sued to recover the deposited fund. The Nevada court entered judgment for the sellers for the entire amount of the deposit. Pending appeal the parties effected a settlement whereby a part of the fund was returned to the buyer and a part distributed among the sellers, including these petitioners.

The contract provided that if the buyer should fail to pay the balance of the price or to perform the obligations assumed, the escrow holder was to pay over to the sellers the deposit to be retained as liquidated damages for breach of contract on the part of the buyer for failure to consummate the purchase.

Petitioners contend that because these amounts were received as a result of the breach of a contract for the sale of a capital asset they bear the same character as amounts received on the sale of such an asset, hence they are taxable as capital gains. We have held otherwise.

In a number of cases we have held that where, in a contract to purchase the controlling stock of a corporation, or other property, a sum has been deposited to apply on the purchase price, or to be retained by or paid over to the seller as liquidated damages if the purchase is not completed, the amount so received by the seller when the purchase is not consummated is taxable as ordinary income. The seller in such cases has the same capital assets as before and has the deposited amount as well. *A. M. Johnson*, 32 B.T.A. 156, 161 (1935); *Doyle* v. *Commissioner*, 110 F. 2d 157, 158 (C.A. 2, 1940), affirming 39 B.T.A. 940, certiorari denied 311 U.S. 658; *Ralph A. Boatman*, 32 T.C. 1188 (1959). See also *Binns* v. *United States*, 254 F. Supp. 889 (M.D. Tenn. 1966), affd. 385 F. 2d 159 (C.A. 6, 1967). In *Boatman* we pointed out that if the taxpayer is to be entitled to treat the amount retained as long-term capital gain there must be a sale or exchange, and that where

the contract of sale was never carried out the transaction left him with the property plus the deposited fund.

This is precisely the case here. The petitioners and their coowners entered into an executory contract to sell all the stock of the corporations and certain other property. Pursuant to the contract, a sum was deposited by the buyers with an escrow agent which was to be applied on the purchase price, or paid over to the sellers as liquidated damages if the buyer failed to pay the balance due and otherwise comply with the terms of the contract. The buyer did not pay the balance, and at the end of the transaction the petitioners and the other sellers had not sold or exchanged or transferred any capital assets. They still had the assets and had $290,000 of the deposited fund.

The petitioners seek to avoid the effect of the foregoing cases by alleging that there were actual damages to the value of their stock interests due to the breach of the sales contract in 1956, and that the cases cited are not controlling because they do not deal with such actual damages.

They allege that during the period of the contract the value of their stock was damaged as a result of:

(a) The release by Agostini of information relating to the sale of the club to him, which they say was a premature announcement.

(b) The lowering of employee morale due to the fact that under Agostini, as the new owner, employees did not know whether their employment would be continued; whether new supervisory personnel would be hired; whether the generous bonus program of the Smith family would be continued; whether the club would continue to stand by and help employees in need; and whether the policies of the Smith family in operating the casino on a less professional basis than others would be changed;

(c) The deterioration of customer attitudes toward the club as a result of the announced change of ownership which they say led many customers to conclude that the odds on slot machines had been changed to be more favorable to the club; that refunds to customers would be curtailed; and that the new operation under Agostini would be more on a professional gambler basis;

(d) The imposition of restrictions upon refunds to customers and upon the expenditure of funds in excess of $5,000 without the consent of Agostini, which in some cases was difficult to obtain;

(e) The decrease in gross revenues from the operation of the slot machines in 1956 by $245,000 from the prior year and the continued decrease in slot machine revenues in 1957;

(f) The actual loss of many customers during the period of the contract;

(g) The contractual limitation imposed upon the management and owners of Harolds Club which prohibited them during the term of the contract of sale from (1) changing the capital structure, articles, or bylaws of the corporation, (2) increasing the compensation of any officer, employee or agent, (3) paying bonuses to officers, (4) paying bonuses to employees except for a specified amount, (5) entering into contracts or commitments extending beyond the closing date, (6) making capital expenditures in excess of $5,000 without the consent of the buyer, (7) selling any fixed assets or improvements without the consent of the buyer, (8) incurring any liability or changing the cash position of the club from the date of execution of the contract of sale to the date of closing, other than in the ordinary course of business, and (9) limiting the amount of refunds to customers that could be made; and

(h) The contractual provisions which (1) prevented the owners of the club from selling or offering to sell their stock to anyone else during the period of the contract, and (2) required them to permit the buyer to observe the business transactions of the club and to inspect the books and records of the club.

The petitioners contend that these factors caused actual damage to the value of their stock interests, that the amounts in issue were received as awards for damages to their capital assets and are therefore to be treated as return of capital and taxable as long-term capital gain. They refer to the stipulation of settlement as admitting on the part of the buyer that the sellers had conclusively proved actual damages in at least the amount agreed upon. They also refer to the offer made in December 1956, while the suit was pending, to purchase the same properties for only $9 million and to the sale by Dorothy of her stock to Raymond I. Smith in 1959 for only $2 million as evidence of the loss in value of the stock as the result of the breach by the buyer.

Petitioners' contentions in the case of *H.H.B., Inc.* v. *Raymond I. Smith, et al.*, in the Nevada District Court were just the opposite of their contentions here. In that case, the plaintiff, the buyer, contended that the deposit in question was unreasonable, was not a genuine preestimate of the actual damages and that the damages, if any, were certain and ascertainable. The defendants therein (petitioners herein) contended that the damages were indefinite, uncertain of proof, and difficult of ascertainment and that the amount agreed upon by the parties as "liquidated damages" was a genuine preestimate of damages, and, since the contract was entered into without fraud or duress, legal effect should be given to the terms of the contract providing for "liquidated damages." Voluminous briefs were submitted by both parties. Most of the elements of damages, now urged by petitioners to

be certain and ascertainable in amount, were there argued by the defendants (petitioners herein) to be uncertain and not ascertainable. The Nevada court concluded that the damages which might result from a breach of the contract were uncertain and incapable of reasonable ascertainment, that the sum agreed upon as "liquidated damages" was a genuine preestimate of the damages and bore a reasonable relationship to the several covenants of the contract. Although not bound by the State court's decision, *Commissioner* v. *Estate of Bosch*, 387 U.S. 456, we think its decision was clearly correct.

In *Sun Printing & Publishing Assn.* v. *Moore*, 183 U.S. 642 (1902), the Supreme Court held that where the damages are of an uncertain nature the parties may estimate and agree upon the measure of damages which may be sustained from the breach of an agreement, and that the naming of a stipulated sum to be paid for the nonperformance of a covenant is conclusive upon the parties in the absence of fraud or mutual mistake.

In *Priebe & Sons* v. *United States*, 332 U.S. 407, 411–412 (1947), although it held, on the facts presented therein, that the amount involved was a penalty and not liquidated damages, the Supreme Court stated:

Today the law does not look with disfavor upon "liquidated damages" provisions in contracts. When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. * * * They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable. * * * And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contracts. [Citations omitted.]

See also *United States* v. *Bethlehem Steel Co.*, 205 U.S. 105 (1907); *Wise* v. *United States*, 249 U.S. 361 (1919); *Hughes Bros.* v. *United States*, 134 F. Supp 471 (Ct. Cl. 1955).

Petitioners cite and rely upon *Alvin B. Lowe*, 44 T.C. 363 (1965). In that case the taxpayer sold all the stock of a corporation which, as lessee, operated a hotel. The buyer made a downpayment, gave a note for the balance of the price, took possession and began operation of the hotel in 1955. In 1958 he defaulted in payment of the remaining purchase price, and reconveyed the stock to the taxpayer, who retained a part of the amount paid on account. We held the retained amount represented capital gain. We distinguished *Boatman* and other cases cited above on the ground that no sales occurred therein, while in *Lowe* there was a completed sale in 1955. In the present case there was no completed sale, hence the *Lowe* case is not applicable here. For the same reason *Henri Chouteau*, 22 B.T.A. 850 (1931), cited by petitioners, is not applicable.

Petitioners also cite as applicable, *Ralph Freeman*, 33 T.C. 323 (1959); *Estate of Mabel K. Carter*, 35 T.C. 326 (1960), affd. 298 F. 2d 192 (C.A. 8, 1962), certiorari denied 370 U.S. 910; *Big Four Industries, Inc.*, 40 T.C. 1055 (1963); *Durkee* v. *Commissioner*, 162 F. 2d 184 (C.A. 6, 1947), remanding 6 T.C. 773, and 181 F. 2d 189 (C.A. 6, 1950), affirming a Memorandum Opinion of this Court upon remand; and *Raytheon Production Corp.* v. *Commissioner*, 144 F. 2d 110 (C.A. 1, 1944), affirming 1 T.C. 952, certiorari denied 323 U.S. 779. These cases do not deal with contracts of sale. They concern compensation for damages to business goodwill by tortious acts, or conspiracies which resulted in the virtual termination of the taxpayer's business. The present case does not involve tortious acts of competitors but arises out of a contract.

In our view, the presence or absence of actual damage to the sellers' business herein is not material. As the Nevada court held, the sellers were entitled, regardless of damages, to retain the deposit by reason of the terms of the contract.

Furthermore, assuming arguendo, that actual damage to the petitioners' stock interests is relevant, they have failed to prove such damage. In 1956, the year Agostini was involved in the club and the default occurred, the gross gaming income increased by 5 percent over the previous year. In the following year, after Agostini was no longer connected with the business, there was a decrease of some 3 percent. Fluctuations in gross income are normal in any business and these minor variations do not prove damage to the business. The several factors alleged to have caused injury to the stock interests do not, in our opinion, support the petitioners' argument. The original contract required that no disclosure of the sale was to be made unless the statement was agreed upon by the parties. Petitioners say that Agostini made a premature announcement of the sale, which had an adverse effect upon the business. One of the petitioners' exhibits is a Reno newspaper item published on March 2, 1956, to the effect that Agostini and Raymond I. Smith in a *joint* statement announced the sale of the club. Raymond I. Smith was one of the sellers. Moreover, if this disclosure was a violation of the contract, it was a violation of the February 29, 1956, contract which was canceled and not of the contract of June 25, 1956, with which we are here concerned. The presence of Agostini in the club was one of the conditions bargained for in the contract. If it had an adverse effect on the business, that was a risk the sellers undertook with the contract. Raymond I. Smith testified that he introduced Agostini to some of the customers as the new owner. If this prospect of a change in the manner of doing business caused customers to leave the club and patronize other casinos, that also was a

risk involved in the bargain assumed by both parties. Similarly, any effect upon the morale of the employees was a foreseeable consequence of the sale. Petitioners say that customers thought the new management was changing the slot machines so that the odds would be more favorable to the club. The testimony indicates that previously customers had often complained of this when they lost. The sellers were aware of this tendency of customers and could reasonably anticipate that a pending change of ownership would increase the customers' suspicions. If the slot-machine revenue was reduced for that reason in the sale period or thereafter, that was a risk assumed by both parties in the contract. Since gross income increased in 1956, the customers evidently chose to lose their money at hazards other than the slot machines. Petitioners say that the sellers had often made refunds to customers who lost more than they could afford to lose and the limitation placed upon such refunds was a factor leading to a loss of customers. The testimony on this point was of too general a nature to be convincing. There was testimony that some 83 percent of the customers were from outside the State of Nevada. We seriously doubt that many came to the sellers' casino on the assumption that they could have losses refunded, or that the loss of those customers asking refunds was injurious to the business.

Petitioners refer to an offer by Ernest S. Brown on December 12, 1956, to purchase the property for $9 million as proof of damage to the value of the stock. Brown was Agostini's attorney in the litigation. This was evidently an offer to settle the case by paying the amount Agostini was able to raise when he was unable to raise the contract price. He hoped to make a better bargain. This offer does not show that the value of the stock was actually reduced. Likewise the purchase in 1959 of Dorothy Smith's one-third interest by Raymond I. Smith for cash of $2 million does not establish that the value of the petitioners' shares had been damaged by the forfeiture in 1956.

Petitioners also contend that the settlement agreement between the sellers and the buyer which stipulated that the sellers had suffered actual damages to their property, the subject of the contract, in excess of $290,000, is proof of actual damages in the amount they received. The agreement was prepared by counsel for the sellers. It is apparent that the buyer, having had judgment entered against it in the amount of $500,000, was not interested in how the settlement was labeled by the sellers so long as it might recover a part of the sum deposited. Moreover, the characterization of the settlement by the parties is not binding on this Court.

Petitioners agreed by contract to permit the buyer's representative, Agostini, to enter the club and observe its operations. They agreed by contract to certain restrictions upon their business activity during the

period the sale was pending. They agreed by contract not to sell to other parties. They agreed, either expressly or impliedly, to all the acts upon which they now base their allegations of damage. They agreed by contract to accept the deposited amount as "liquidated damages" if the buyer did not complete the purchase. The payments they received were not gains from the sale of capital assets, for there was no completed sale. They were not payments for tortious acts of others causing injury to their business. The payments arose out of the contract and were the price the buyer paid and they, the sellers, agreed to accept upon default as payment for the restrictions they agreed to place upon their business operations during the sale period. They received what they bargained for. We hold, following *Ralph A. Boatman, supra,* and *A. M. Johnson, supra,* that the amounts so received are taxable as ordinary income.

*Decisions will be entered for the respondent.*