PHILIP HANDELMAN and ESTHER HANDELMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Handelman v. Commissioner
Docket No. 4913-67.
United States Tax Court
T.C. Memo 1973-57; 1973 Tax Ct. Memo LEXIS 230; 32 T.C.M. (CCH) 249; T.C.M. (RIA) 73057; March 7, 1973, Filed Thomas P. Dougherty, for the petitioners. Marion L. Weston, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent has determined deficiencies and additions to the Federal income tax of 2 the petitioners as follows: Year
Income Tax
[1] Addition to the tax Section 6653(a) 1961
$ 5,654.87
$282.74
1962
37,192.35
-
1963
42,249.33
-
1964
1,588.03
-
1965
2,758.78
-
As a result of agreements or concessions made by the parties, together with the failure of the petitioner to present any proof with respect to certain adjustments, [2] the remaining questions for decision are as follows: (1) Whether the amount of $95,000 received by the petitioner in connection with the purported sale of stock of Graphic Arts Exhibit Building, Inc., constituted ordinary *232 income or the gain from the sale of a capital asset. (2) Whether the petitioners are entitled to claim deductions for expenses incurred in connection with the maintenance and operation of a46-foot sailing sloop during the taxable years 1963 to 1965, inclusive. 3 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners are Philip Handelman and Esther Handelman, his wife. [3] Their residence at the time of the filing of the petition herein was in New York, New York. The petitioner is an attorney at law, licensed to practice in the State of New York. For the taxable years ended December 31, 1961 to December 31, 1965, inclusive, the petitioners filed joint United States income tax returns with the district director *233 of internal revenue, Manhattan District, New York, on the cash basis method of accounting. An amended return for the taxable year 1965 was filed on March 14, 1966. On or about January 20, 1961, petitioner caused to be organized under the laws of the State of New York, Graphic Arts Exhibit Building, Inc., (hereinafter referred to as "Graphic Arts") for the purpose of erecting and 4 leasing space in a building at the site of the New York World's Fair 1964-1965. A total of 200 shares of stock of said corporation were duly authorized. In June 1961, the petitioner entered into an agreement with Thomas R. O'Connor (hereinafter referred to as "O'Connor"), providing that O'Connor was to be employed by Graphic Arts in exchange for advancing working capital in the amount of approximately $100,000, with the understanding that he was to acquire some stock in the corporation. Following this discussion, O'Connor contacted the petitioner and offered to purchase all of the stock of the corporation. In the ensuing negotiations, O'Connor acted on behalf of himself and of his partner and financial backer, Joan G. Van de Maele (hereinafter referred to as "Van de Maele"). During 1961, *234 Van de Maele paid the petitioner $25,000 which was reported as ordinary income from his legal practice in the petitioners' joint Federal income tax return for that year. In December 1961, it was agreed upon that O'Connor and Van de Maele would purchase certain shares of the 5 stock of Graphic Arts from the petitioner. Van de Maele thereupon executed two notes, dated December 8, 1961, payable to the order of the petitioner on June 8, 1962, in the amounts of $50,000 and $17,000, respectively. At the same time, Van de Maele executed a note payable to one Dr. A. Alfred Solomon in the amount of $48,000 on account of the purchase of additional shares of Graphic Arts stock. On February 20, 1962, the sum of $30,000 was transmitted to the petitioner by Van de Maele through the Banco Credito de San Juan, San Juan, Puerto Rico, and credited to the account of petitioner's wife, E. M. Handelman, 295 Madison Avenue, New York, New York, at the Chemical Bank New York Trust Co. By bank check dated March 26, 1962, Van de Maele paid the petitioner the additional amount of $40,000 which was credited to his account at the Chemical Bank New York Trust Co.
On or about June 8, 1962, the two *235 notes payable to the petitioner in the amounts of $50,000 and $17,000, respectively, and the notes payable to Dr. Solomon in the amount of $48,000, were duly presented for payment and were not paid. 6 Thereafter, by an agreement dated June 13, 1962, between petitioner and O'Connor, the terms of the proposed sale of the stock of Graphic Arts were modified. O'Connor and Van de Maele executed an additional note in the amount of $59,000 payable September 14, 1962, to the order of the petitioner. Pursuant to the agreement of June 13, 1962, payment of the prior notes aggregating $115,000 which were then in default was to be made on or before June 15, 1962, in exchange for 63 shares of the stock of Graphic Arts. Upon payment of the additional note in the amount of $59,000, the remaining 25 shares of said stock would be delivered to O'Connor. In the interim, the stock was placed in escrow pursuant to the following agreement: IT IS HEREBY AGREED by and between THOMAS R. O'CONNOR the First Party, and PHILIP HANDELMAN, for himself and others, as the Second Party, as follows: 1) PHILIP HANDELMAN represents that GRAPHIC ARTS EXHIBIT BUILDING INCORPORATED (hereinafter called "GRAPHIC *236 ARTS") is a duly organized and validly existent corporation under the laws of the State of New York, and further makes those representations set forth on Exhibit "A" annexed hereto. 7 2) The First Party for himself and in representative capacity, is indebted to the Second Party in the sum of ONE HUNDRED SEVENTY FOUR THOUSAND ($174,000) DOLLARS, represented by four (4) non-interest bearing promissory notes in the following sums: FIFTY THOUSAND ($50,000) DOLLARS; SEVENTEEN THOUSAND ($17,000) DOLLARS; FORTY EIGHT THOUSAND ($48,000) DOLLARS and FIFTY NINE THOUSAND ($59,000) DOLLARS, the first three of the above cited notes being presently in default, and aggregating ONE HUNDRED FIFTEEN THOUSAND ($115,000) DOLLARS. 3) The Second Party will deposit with AUSTIN GREY of CHEMICAL BANK NEW YORK TRUST COMPANY, as escrowee, eighty-eight (88) shares of the capital stock of GRAPHIC ARTS, duly endorsed in blank which shares shall be released by said escrowee in accordance with the terms of Paragraphs "4" and "5" hereof. 4) In the event that said three notes in the total amount of ONE HUNDRED FIFTEEN THOUSAND ($115,000) DOLLARS are paid on or before June 15, 1962 said AUSTIN GREY will *237 delivery [sic] sixty-three (63 shares of said eighty-eight (88) shares to THOMAS R. O'CONNOR, or his designee, and will continue to hold in escrow twenty-five (25) shares pending the payment of the note dated June 13, 1962 payable September 14, 1962 in the sum of FIFTY NINE THOUSAND ($59,000) DOLLARS. All voting rights with respect to said twenty-five (25 shares shall be exercisable until an event 8 of default shall have occurred under the aforementioned note, by the Second Party, and the First Party shall deliver to the escrow agent an irrevocable proxy covering the period from the date of payment of the three (3) notes referred to in Paragraph "4" hereof to the earlier of September 14, 1962, or the payment of the FIFTY NINE THOUSAND ($59,000) DOLLAR note referred to above. 5) In the event that the full amount of said three notes totalling ONE HUNDRED FIFTEEN THOUSAND ($115,000) DOLLARS is not paid on June 15, 1962, the escrowee shall return all papers and documents to PHILIP HANDELMAN.
6) In the event of none-payment [sic] of said FIFTY NINE THOUSAND ($59,000) DOLLAR note, at its maturity, the escrowee will return the said twenty-five (25) shares to the Second Party. *238 Dated: New York, New York
June 13, 1962
/signed/
Thomas R. O'Connor, First Party /signed/ Philip Handelman, Second Party The notes referred to in paragraph 5 of the agreement were not paid, when due, and by letter agreement, dated July 6, 1962, the petitioner and O'Connor extended the date of payment until July 11, 1962. There were no other changes relating to the 9 June 13, 1962 agreement. None of the notes were paid when due, and the escrow was thereupon terminated and the stock returned to the petitioner. On or about March 14, 1963, the petitioner delivered certificates representing 104 shares of the capital stock of Graphic Arts to the Bankers Trust Co., as escrowee. The receipt for those shares, dated March 14, 1963, provided that upon notification to the escrowee of the consummation of a loan in the principal sum of $500,000 by and between the Exchange Bank & Trust Co. of Dallas, Texas and Graphic Arts, the Bankers Trust Co., as escrow agent, would deliver to the petitioner a check in the amount of $150,000, and to one Raymond Barger a check in the amount of $10,000 and would forward to the Exchange Bank & Trust Co. of Dallas, or its designee, the 104 shares *239 of the capital stock of Graphic Arts. The payment of $150,000 was intended to satisfy the three notes held by petitioner in the amount of $126,000, together with an additional $24,000. By receipt of the Bankers Trust Co., dated March 20, 1963, the escrow arrangement and time for 10 payment were subsequently extended to March 25, 1963. There were no other changes relating to the arrangement expressed in the receipt of the Bankers Trust Co., dated March 14, 1963. Both receipts provided that in the event the loan transaction was not consummated, the stock certificates were to be returned to the petitioner. The loan agreement was not completed, the payments were not made and the escrow was terminated. Thereafter, in April 1963, the petitioner initiated an action in the Supreme Court of the State of New York, County of New York, against Van de Maele and O'Connor to recover on the promissory notes, the amount of the additional payments provided in the March 1963 escrows, and the amount of certain disbursements, allegedly incurred by the petitioner, which Van de Maele and O'Connor had purportedly agreed to pay. By order dated December 7, 1965, the Supreme Court of the State *240 of New York, County of New York, granted the petitioner's motion for a summary judgment on the promissory notes. The Court further ordered, 11 however, "* * * that any judgment against the defendant JOAN G. VAN DE MAELE will await the final determination of the issues with respect to her claim of payment by unpaid and past due advances made to plaintiff, * * *." The court further denied the petitioner's motion for a summary judgment and severed the action with respect to his alleged claim for an additional $24,000 arising from the March 1963 escrow agreements. The suit against Van de Maele was finally discontinued by agreement between the parties in April 1970 upon the payment by Van de Maele of $89,500, at which time petitioner delivered to the buyer certificates evidencing 64 shares of stock of Graphic Arts. Pursuant to Section 203-A of the Tax Law of New York State, Graphic Arts was dissolved by proclamation of the secretary of state published on the fifteenth day of December 1965 for nonpayment of taxes since December 31, 1961.
During the years 1963 to 1965, inclusive, the petitioner owned a 46-foot sailing sloop named Chee Chee V. The petitioner incurred expenses (including *241 12 depreciation) in connection with the maintenance and operation of his boat, in the amounts set forth below: 1961
$ 3,857.00
1962
6,395.89
1963
9,107.25
1964
6,849.87
1965
12,255.88
In computing his taxable income on his Federal tax returns for such years, the petitioner claimed the above expenses as a business deduction. The petitioner is a long time sailing enthusiast, having begun to sail sometime in the 30's and having gained recognition as a sailor by winning the Bermuda race and others. The petitioner raced his boat in several well known races each year, including the Bermuda race and the Martha's Vineyard Race. At such times, various members of the crew were either clients of petitioner or were possible sources of business. The petitioner maintained no formal records showing the guests entertained on the boat. However, in his office, petitioner maintained diaries and 13 telephone records from which schedules were prepared showing the occasions upon which petitioner entertained persons on his boat from whom or through whose efforts petitioner obtained legal business. For the taxable years 1961 and 1962, the parties have agreed that *242 60 percent of the expenses incurred in the maintenance and operation of the boat were allowable as business expenses. The petitioner has substantiated a similar use for the taxable years 1963 to 1965, inclusive. OPINION The principal issue remaining for decision, as stated in the notice of deficiency, is whether certain payments aggregating $95,000 received by the petitioner "in connection with a contract to sell certain shares of Graphic Arts Exhibit Building, Inc., is taxable as ordinary income." At the trial, the parties made certain concessions with respect to the taxable years in which such payments shall be deemed taxable, and the Court will be governed thereby. By reason thereof, we are concerned solely 14 with the characterization of the income received by the petitioner rather than the year in which such income should be reported for tax purposes. The facts are not subject to dispute. It appears that in 1961 the petitioner obtained a concession to erect a building for the graphic arts on the site of the New York World's Fair 1964-1965. He organized Graphic Arts for the purpose of erecting and leasing such building and set about to obtain the necessary funds. *243 He offered O'Connor, a former client, the role of "promoter" with the understanding that O'Connor would be given an opportunity to acquire stock in the corporation. O'Connor obtained financial backing from Van de Maele and, acting on her behalf, undertook purchase of the stock of the corporation. During the years 1961 and 1962, Van de Maele paid or advanced the petitioner a total of $95,000 and gave the petitioner notes aggregating $126,000 on account of such agreement. 15 At various times, the stock of the corporation was placed in escrow to be delivered to O'Connor and Van de Maele upon payment of the notes. Efforts to complete the sale continued until March 25, 1963, when the last extension for the payment of the notes expired and the stock which had been deposited in escrow was returned to the petitioner. Promptly thereafter, petitioner filed suit against O'Connor and Van de Maele and was granted a summary judgment for the amount of the notes. While respondent argues in his brief that petitioner has failed to prove that the cash payments of $95,000, the characterization of which are in dispute, related to the sale of the stock, there is no basis for such argument. *244 Petitioner's account of the transaction is fully supported by the decision of the New York court in a related case filed by petitioner, as counsel for Dr. A. Alfred Solomon, to recover on the notes given to Solomon by Van de Maele. Solomon v. Van de Maele, 250 N.Y.S. 2d 772 (Sup. Ct. 1964). The notice of deficiency is predicated on the assumption that the payments were received in connection with the sale of such stock, but are taxable as ordinary income because no sale was ever consummated. 16 Where a contract for the sale of property provides that upon a default by the purchaser the seller may keep the property and any amounts paid thereunder as liquidated damages, such amounts have been held taxable as ordinary income. Presumably, this on the theory that there has been no sale but merely the payment of damages. See Harold S. Smith, 50 T.C. 273 (1968), affirmed per curiam 418 F. 2d 573 (C.A. 9, 1969), and cases there cited; Meyer Mittleman, 56 T.C. 171 (1971). On the other hand, where a sale has been completed and subsequently *245 the buyer, being unable to pay the balance due, agrees to return the property to the seller in discharge of his obligation to pay the balance, this Court has held that the amounts previously paid nevertheless constituted gain from the sale of a capital asset. Alvin B. Lowe, 44 T.C. 363 (1965). See also: Myers v. Commissioner, 287 F. 2d 400 (C.A. 6, 1961), affirming a Memorandum Opinion of this Court; Binns v. United States, 254 F. Supp. 889 (1966), affd. 385 F. 2d 159 (C.A. 6, 1967). 17 Renegotiation of the terms of the sale does not change the character of the transaction. Harold Wener, 24 T.C. 529 (1955), affd. 242 F. 2d 938 (C.A. 9, 1957). It is clear from the record in this case that the petitioner was at all times ready and willing to deliver the stock sold to the buyers upon payment of the notes. Under the laws of New York governing this transaction, [4] it appears that "Unless a different intention appears, * * * Rule 1. Where there is an unconditional contract to sell specific goods, in *246 a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed. [N.Y. Pers. Prop. Law, sec. 100 (McKinney 1962)] See Rosenzweig v. Salkind, 158 N.Y.S. 2d 522 (Sup. Ct. 1956), reversed on other grounds 169 N.Y. Supp. 213 (Sup. Ct. 1957), affd. 183 N.Y.S. 2d 82 (1959). 18 Therefore, the ownership passed upon payment of the cash and execution of the notes, leaving petitioner with nothing more than a vendor's lien. See N.Y. Pers. Prop. Law, section 134(1) (a) (McKinney 1962); Newman v. United Distillers Co., Inc., 175 N.Y. Supp. 176 (Sup. Ct. 1919); Rosenzweig v. Salkind, supra. However, we need not go that far. As we view the facts in this case, the respondent is in error. Petitioner, at all times, was attempting to complete the transaction. There was no forfeiture. *247 When the purchasers failed to pay the notes when due, and after the expiration of each extension or new escrow set up by the petitioner, the petitioner could elect either to take back the stock and call the whole deal off or to file suit on the notes and be prepared to deliver the stock to the purchasers. See N.Y. Pers. Prop. Law, Sections 134 and 144 (McKinney 1962); Solomon v. Van de Maele, supra. See also Doyle's Main Motors v. Davis, 118 N.Y.S. 2d 867 (Sup. Ct. 1953). 19 If petitioner had elected to terminate the agreement, not only would his right ultimately to collect on the notes be jeopardized, but he might be called upon to refund the cash payments which had been received by him because "a provision for liquidated damages is never read into a contract by implication * * *." People v. Condor of Americas, Inc., 252 N.Y.S. 2d 619 (Sup. Ct. 1964); see also Winkelman v. Winkelman, 203 N.Y. Supp. 63 (Sup. Ct. 1924); cf. Pirman v. Kurtz, 45 N.Y.S. 2d 508 (Sup. Ct. 1943). "* * * [Recission] can be effective only *248 by returning or tendering back the consideration received." Gilbert v. Rothschild, 280 N.Y. 66, 19 N.E. 2d 785 (1939), and cases there cited. Obviously, it was to the advantage of the petitioner not to claim a forfeiture but rather to proceed with the collection of the notes, in which event the petitioner would have to be prepared to make delivery of the stock. It is immaterial that when the litigation was finally settled the time for erecting the building at the New York World's Fair had 20 expired and the stock had become worthless. The fact that the buyers were forced to bear that risk confirms our conclusion that the sum of $95,000 received by the petitioner constituted a long-term gain from the sale of a capital asset within the meaning of section 1222, [5]
*249 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. It is presumed that petitioners have conceded those adjustments not settled by stipulation or to which no evidence was addressed since they have the burden of proof. ↩
3. Esther Handelman is a petitioner herein solely by virtue of having filed a joint return with her husband. Hereinafter, references to "petitioner" are to Philip Handelman. ↩
4. Art. 5, N.Y. Pers. Prop. Law (McKinney 1962) repealed by section 10-102 of the Uniform Commercial Code↩, effective September 27, 1964. 5. Sec. 1222(3) provides: (3) Long-term capital gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income. During the taxable years 1961 to 1965, inclusive, the taxpayer maintained a 46-foot offshore sailing yacht "Chee Chee V." The parties agree that the cost of maintenance and operation of the yacht during the years in question was, as follows: 1961
$ 3,857.00
1962
6,395.89
1963
9,107.25
1964
6,849.87
1965
12,255.88
For the taxable years 1961 and 1962, the parties further agreed that 60 percent of such costs were properly deductible by the petitioner as an ordinary and necessary expense within the meaning of section 162. For the taxable years 1963 to 1965, inclusive, the respondent has disallowed any deduction on account of the agreed upon costs on the ground that the petitioner failed to comply with the requirements of section 274(a) and (d) with respect to the maintenance of records relating to the use of the yacht. Insofar as material herein, section 274 provides: (a) Entertainment, Amusement, or Recreation. - (1) In general. - No deduction otherwise allowable under this chapter shall be allowed for any item - * * * (B) Facility. - With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) 22 directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business. (2) Special rules. - For purposes of applying paragraph (1) - (A) Dues or fees to any social, athletic, or sporting club or organization shall be treated as items with respect to facilities. (B) An activity described in section 212 shall be treated as a trade or business. * * * (d) Substantiation Required. - No deduction shall be allowed - (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of the type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other 23 item and (D) the business relationship to the taxpayer of persons entertained, using the facility or receiving the gift. The secretary or his delegate may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. With respect to the question whether the facility was "primarily" used by the petitioner for the purpose of "entertaining" clients and others who might be instrumental in forwarding litigation to the petitioner in furtherance of his business, petitioner submitted a list compiled from his office records showing the names of various guests entertained aboard the yacht. In a substantial number of instances, the petitioner testified with respect to the relationship of the named individuals to an actual or potential source of litigation. While the petitioner did not account for all occasions on which the yacht may have been used by him, in our opinion such records were adequate to meet the test of primary use with respect to the facility. LaForge v. Commissioner, 434 F. 2d 370 (C.A. 2, 1970), reversing 53 T.C. 41 (1969); William F. Sanford, 50 T.C. 823 (1968), affirmed per curiam 412 F. 2d 201 (C.A. 2, 1969), certiorari denied 396 U.S. 841 (1969). 24 Having met the primary use test with respect to the facility, it then becomes necessary to determine the specific amount or cost which the petitioner is entitled to deduct as a business expenditure under section 162. In this respect, the actual amounts expended are not in question. The parties have agreed upon the costs of operating and maintaining the yacht during the years in question. For the most part, these were general expenses which can only be chargeable on the basis of the ratio of business use of the facility to its total use. In the mind of the petitioner, it was all business. With that, we must disagree. We are satisfied, however, that the petitioner has substantiated his right to the deduction of not less than 60 percent of such costs for the taxable years 1963 to 1965, inclusive. Our conclusion is buttressed by reference to the fact that this was the basis agreed upon by the parties for the taxable years 1961 and 1962 in the absence of the more specific requirements of section 274 with respect to the maintenance 25 of records. While it must be admitted that a more precise result could have been achieved if petitioner had kept a formal log, comparable information supplied from contemporary records is an acceptable substitute. LaForge v. Commissioner, supra.
The respondent determined that an addition to the tax for negligence or intentional disregard of rules and regulations was due from the petitioners under the provisions of section 6653(a) for the taxable year 1961. That determination is presumptively correct and in the absence of evidence from the petitioner to rebut it, we are constrained to sustain the respondent. James W. England, Jr., 34 T.C. 617 (1960); James S. Reily, 53 T.C. 8 (1969). To reflect concessions made by the parties, and the conclusions reached herein, Decision will be entered under Rule 50. ↩