*Decisions will be entered under Rule 50.*

ALVIN B. LOWE AND RUTH LOWE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4745–62. Filed June 11, 1965.

*Thomas L. Wolfe*, for the petitioners.

*Kenneth G. Anderson*, for the respondent.

DAWSON, *Judge:* [1] Respondent determined a deficiency in petitioners' income tax for the taxable year ended December 31, 1958, in the amount of $14,364.84.

The deficiency is based upon respondent's determinations that $22,500 retained by Alvin B. Lowe on the reacquisition of stock in 1958 represents ordinary income to him and that certain management expenses are not deductible as ordinary and necessary business expenses. The parties have agreed that a portion of the management expenses is deductible. Thus the only issue remaining for decision is whether the amount retained by petitioner Alvin B. Lowe on the reacquisition of F. H. Operating Co. stock in 1958 was taxable to him as ordinary income or as capital gain.

### FINDINGS OF FACT

Some facts were stipulated by the parties and are found accordingly.

Alvin B. Lowe and Ruth Lowe are residents of Miami Beach, Fla. They filed their joint income tax return for the taxable year ended December 31, 1958, with the district director of internal revenue, Jacksonville, Fla. All subsequent references to petitioner shall mean Alvin B. Lowe.

In July 1955 petitioner owned all of the 250 outstanding shares of F. H. Operating Co., an Ohio corporation (hereinafter sometimes called lessee). The principal nonliquid asset of this corporation was a lease dated December 16, 1947, from Fenway Hall Hotel Corp., an Ohio corporation (hereinafter sometimes called lessor), on an apartment and commercial hotel located in Cleveland, Ohio.

Relevant terms of the lease were as follows:

1. The term was for 10 years with the lessee having an option immediately prior to the end of the term to renew for an additional 15 years if it had performed all terms and conditions of the lease.

2. Lessee agreed to deposit with the lessor U.S. bonds, in bearer form, of $150,000 par value as security for faithful performance of the terms and conditions. If the lessee failed to so perform, the bonds would belong to the lessor as fixed, liquidated, and agreed damages.

3. The lessee was required to carry liability insurance, fire insurance on the hotel's contents, and fire and windstorm insurance on the

---

[1] This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on Feb. 11, 1965. This case, not having been disposed of, was reassigned to Judge Howard A. Dawson, Jr., on Feb. 25, 1965, and notice was given to the parties that any request for rehearing or reargument could be presented to Judge Dawson within 30 days. By agreement the parties have waived further hearing, but filed with the Court on May 26, 1965, a supplemental stipulation of facts.

building; to replace all broken glass; to comply with all fire regulations; to remove all waste materials, garbage, and rubbish from the premises and to provide proper receptacles for same; and to yield the premises in good order and condition on the termination of the lease except for ordinary wear and tear and damage not the fault of the lessee.

4. If the lessee defaulted in payment of rent ($9,583.33 per month) and continued in default for 10 days, or if it defaulted in any of the other terms and conditions of the lease without same being cured within 30 days, or if it filed a petition in bankruptcy or was adjudicated a bankrupt, or made an assignment for the benefit of creditors or took advantage of any insolvency act, the lessor had the right to terminate the lease on 5 days' notice. Failure to cure the default within the 5-day period meant that the lessor could require forfeiture of the security.

5. The lessee could assign the lease without the lessor's consent, provided the assignment was to "reputable hotel operators" and the assignee assumed all terms and conditions of the lease.

On July 31, 1955, petitioner and A. W. Levitus entered an agreement whereby petitioner [2] agreed to sell all of the stock of lessee to Levitus for $185,000. The agreement recites that $35,000 was paid on signing and the balance of the purchase price, $150,000, was payable in 88 consecutive monthly installments of $1,000 each beginning October 1, 1955, with principal unpaid at the end of such period payable by March 1, 1963. Interest at 5½ percent on the unpaid balance was to be computed and paid with each monthly installment, with interest on the remaining principal of $62,000 that was payable by March 1, 1963, to be accrued from the date of the final monthly payment and paid with the final payment of principal.

Other relevant terms of the agreement were as follows:

1. Levitus was required to devote his time and best efforts to conducting the business in a "high-grade" manner.

2. Levitus could not assign the agreement without the petitioner's consent.

3. Hotel revenues had to be used for taxes, license fees, Government charges, rent, and operating costs before they could be used for alterations to the property or payment of compensation to Levitus.

4. If Levitus was not in default immediately prior to the end of the original lease, he could at that time elect to exercise the option to renew the lease for the additional term of 15 years.

[2] The agreement recites that the sellers are Alvin B. Lowe and Ruth Lowe, and that they own all of the stock of lessee. The parties stipulated, however, that Alvin B. Lowe "held" the shares in 1955 and that he and Levitus entered the agreement. The discrepancy is not material.

5. The lessee's current accountant was to continue to audit the operations and was to submit monthly operating statements to petitioner.

6. Concurrently with Levitus' payment of $35,000 to petitioner, the latter would deliver to the parties' escrow agents the lessee's shares endorsed in blank and its corporate books and records. The escrow agents would hold these articles until the purchase price was completely paid and at that time would deliver them to Levitus.

7. Petitioner could elect to transfer the shares to Levitus and in case of such election Levitus would deposit the shares with petitioner as security for payment of the balance of the purchase price. Concurrently, Levitus would be required to execute a note payable to petitioner or order incorporating the terms of payment previously stated.

8. If Levitus executed the note and observed its terms, he was to have all beneficial rights in the shares of lessee, except he could not vote the shares for any of the following purposes:

(a) to dispose of or encumber any of lessee's property;

(b) to alter the lease or enter any agreement with the lessor that would affect the Government bonds held as security thereunder;

(c) to dissolve, liquidate, or reorganize the lessee, or consolidate or merge it with another corporation, unless he deposited with petitioner, in substitution for the pledged stock, security satisfactory to petitioner;

(d) to alter the lessee's authorized capital or declare or pay any dividends;

(e) to borrow money or issue evidences of indebtedness, except for loans from Levitus to lessee in the ordinary course of lessee's business; but such loans had to be subordinated to other creditors and could not be repaid until petitioner's note was paid; and

(f) to authorize any advance to, or withdrawal by, any shareholder, director, or officer, except in payment of reasonable compensation to such person.

9. In the event of default in payments on the note, or of rent, or of any other amounts due under the agreement or the lease, or failure to perform the terms and conditions of the lease or agreement, or if the company became insolvent or if a petition in bankruptcy or for reorganization was filed against it and it was adjudicated a bankrupt, or if an assignment for the benefit of creditors was made or if a receiver was appointed, then the holder of the note could declare the entire balance immediately due and payable and become vested with all rights of both shareholders of record and beneficial owners of the shares. The holder would also have the right (a) to sell the shares, (b) to put title to the shares in his own name, and (c) to remove all officers and directors of lessee.

10. If Levitus defaulted in the payment of rent or other charges under the lease, or in the payment of principal or interest due under the agreement, or in the performance of the terms and conditions of

the lease or the agreement, petitioner had the right to end his authority to manage the hotel. If such termination occurred, all amounts that had been paid by Levitus to petitioner under the agreement were to be retained by petitioner as liquidated damages.

11. If the lessee's current assets on July 31, 1955, exceeded its current liabilities, such excess would be paid to petitioner; if the current liabilities exceeded the current assets, petitioner would pay such excess to Levitus.

Petitioner transferred the shares to Levitus and Levitus executed on July 31, 1955, a note for $150,000 payable to petitioner and his wife under the terms previously stated. The note was secured by deposit of the shares. Pursuant to the terms of the agreement, Levitus paid $35,000 to petitioner on signing and made 30 monthly payments of $1,000 each, plus interest, between the signing of the agreement and 1958.

Petitioner's adjusted basis for the stock of lessee was $75,000. He did not include any part of the $65,000 paid toward the purchase price in his gross income. Such exclusion was based on advice of counsel that he need not include such receipts in gross income until he had recovered his adjusted basis for the shares.

Shortly before December 1957, the end of the original lease period, Levitus, in accordance with the terms of the 1955 agreement, elected to renew the lease. He was not in default under the agreement at the date of such renewal. However, petitioner noticed from the accountant's reports for the latter months of 1957 that the operation of the hotel was in the red and the amount of its accounts payable was increasing. He received assurances from Levitus that the situation would improve, but by early 1958 it had not.

In early February 1958, petitioner's counsel in Cleveland received a letter from counsel of the lessor informing him of the lessor's concern about the deteriorating condition of the hotel and expressing the hope that the operator would take prompt action to remedy such condition.

Subsequent to the receipt of this letter petitioner discussed the matter with Levitus and the result was an agreement executed by them on March 20, 1958. It recited that $65,000 had been paid on the purchase price of the stock; that petitioner claimed he was entitled to retain the entire $65,000 as liquidated damages because of Levitus' nonperformance of the 1955 agreement; that Levitus claimed the liquidated damages provision in the 1955 agreement was in effect a penalty provision and thereby unenforceable; that to settle the dispute, the parties agreed that:

1. Petitioner would retain as liquidated damages $22,500 of the $65,000 and return $42,500 to Levitus in the form of $39,500 cash and a promissory note for $3,000.

2. Levitus would pay $37,500 to the lessee.

3. Levitus would release petitioner from all claims and would assign all right, title, and interest in the 250 shares of lessee to petitioner.

4. Petitioner would release Levitus from all claims "of every kind and nature."

In a separate instrument dated March 20, 1958, lessee and Levitus released each other from all claims.

After the execution of these agreements, petitioner assumed operation of the hotel and began correcting its deteriorated condition. He also paid the hotel's debts and took other action to comply with the terms of the lease.

In 1960 petitioner entered an agreement to sell the stock of lessee.[3] The selling price was $172,395.53, of which $50,000 was received in 1960. In 1961 petitioner collected $20,316.94 and in 1962, $6,421.88 on the selling price.

Petitioner treated the adjusted basis of the stock in the 1960 sale as $91,115.27. The figure was determined by adding the expenses of the sale, $16,115.27, to the $75,000 adjusted basis of the stock at the time of the 1955 sale.

Petitioner adopted the same approach he used in the 1955 transaction, excluding the amounts paid from 1960 through 1962 toward the purchase price from his gross income.

The 1960 purchaser defaulted and returned the shares to petitioner in November 1962. Petitioner again began operation of the hotel.

In 1963 the lessee and the lessor agreed to cancellation of the lease, and the lessee was allowed to retain $30,000 of its $150,000 security deposit. Petitioner began in that same year the process of dissolving the lessee.

### ULTIMATE FINDINGS

1. Petitioner sold his 250 shares of capital stock of the F. H. Operating Co. to Levitus in 1955.

2. In 1958 petitioner reacquired all of his shares of capital stock of the F. H. Operating Co. from Levitus.

3. The $22,500 in issue represented capital gain to petitioner in 1958.

### OPINION

The only remaining issue is a determination of the correct tax treatment in 1958 of $22,500 received by petitioner pursuant to an agreement to sell stock.

Petitioner argues that a sale of the stock occurred in 1955 and contends, in the alternative, that the $22,500 should (a) reduce his adjusted basis for the stock, (b) be treated as capital gain, or (c) be

---

[3] Although petitioner testified that he "sold the lease and the stock was put as security," he also stated that the agreement to sell was basically the same as the 1955 agreement.

treated as ordinary income and he should receive an ordinary loss on liquidation of the lessee corporation. By contrast, respondent contends that no sale occurred and that the $22,500 was ordinary income.

We agree with petitioner that a sale of the stock occurred in 1955 because the greater bundle of rights and attributes of ownership, including title, possession and management, and the burdens and benefits accompanying same, passed to Levitus in 1955. *2 Lexington Avenue Corp.*, 26 T.C. 816 (1956), acq. 1956–2 C.B. 8. This is borne out by an examination of the agreement of July 31, 1955, between petitioner and Levitus.

Respondent points to the following language in the 1955 agreement as evidence of no sale:

Notwithstanding such authority, Buyers shall have no right or power as either a stockholder, officer or director of the Company until such time as the shares of stock shall be placed of record in his name or until the balance of the purchase price shall have been paid.

He urges that the purchase price was never paid and that the shares were never placed of record in Levitus' name. However, the agreement also provides:

4. Sellers may elect, although not required so to do, to transfer the shares of stock so that they may be of record in the name of the Buyer. In case the Sellers shall so elect the Buyer shall deposit with the Sellers the certificates for all of such shares, endorsed in blank, and such shares shall be held as security for the payment of the balance of the purchase price. Concurrently with the transfer of such shares in the name of the Buyer and the deposit of such shares as security, the Buyer shall execute and deliver to the Sellers the promissory note of the Buyer payable to the Sellers or their order requiring payments of principal and interest in the installments and at the time and times provided for in 1(b) above, a copy of the form of said note is hereto attached marked "Exhibit A" and made a part hereof.

The note and the agreement were executed concurrently and the note recited that the shares were deposited with the lessor as security for its payment. Therefore, the language cited by respondent is not conclusive evidence of no sale.

To the contrary, a summary of the transaction shows the following:

Under the agreement current liabilities of the corporation on July 31, 1955, would be paid by the seller, to the extent that they exceeded current assets on that date; if current assets exceeded current liabilities, the seller would receive such excess. The seller was to receive the collections from all accounts receivable outstanding on that date and reserved the right to enforce collection by legal proceedings in the name of the company.

The buyer became responsible for all taxes, license fees, and similar charges for the period after July 31, as well as rent due to the lessor, operating expenses of the hotel, and any expenditures for alteration of the hotel.

If the buyer was not in default he had the sole right to renew the lease in 1957.

The seller elected to transfer the shares of record in the name of the buyer, and concurrently the buyer executed a promissory note payable to the seller or his order for the balance of the purchase price and deposited the shares with the seller as security for payment of the purchase price.

The buyer retained all beneficial rights in the shares as long as the terms of the note were observed, except that he could not vote the shares to (a) dispose of any corporate assets or modify the lease; (b) encumber corporate assets; (c) reorganize or liquidate the corporation; (d) alter the corporation's authorized capital; (e) declare dividends; (f) borrow money other than for use in the ordinary course of business; and (g) advance corporate funds to officers, directors, and shareholders, except in payment of reasonable compensation.

As previously indicated, we think there was a sale of the stock to Levitus in 1955. The petitioner retained only a security interest in the shares. Levitus assumed all responsibility for the hotel lease represented by the stock, and only he would enjoy the profit or suffer the loss occurring from the operation of the hotel after July 31. See *Hoffman* v. *Commissioner*, 71 F. 2d 929 (C.A. 2, 1934). He had possession of and dominion over the property represented by the stock itself. *Shipowners and Merchants Tugboat Co.*, 22 B.T.A. 1084 (1931), appeal dismissed 66 F. 2d 1010 (C.A. 9, 1933). See also *Nina J. Ennis*, 17 T.C. 465 (1951).

The retained security interest and the restrictions on voting of the shares by Levitus do not require a different conclusion. The restrictions did diminish Levitus' dominion over the stock, but petitioner's testimony shows that the parties considered that Levitus was buying the shares only to obtain the hotel lease and the excess purchase price reflected the Government bonds deposited by the lessee to insure its performance of the terms of the lease: "The best we could do was get $35,000 for the lease and he [Levitus] was to pay us back our lease deposit [$150,000] in monthly installments." Later petitioner testified in reference to a 1960 transaction concerning the same shares:

Q. Did you sell the stock or the lease?

A. We sold the lease and the stock was put up as security.

Q. In other words, basically the same type of agreement as we have here? [Referring to the 1955 agreement.]

A. Yes, sir.

We regard the restrictions on petitioner's voting of the shares, under these facts, to be a form of security. Petitioner had turned over to Levitus, for cash of only $35,000, the operation of a corporation owning $150,000 in Government bonds with only the bonds backing the

shares pledged as security. The lessor could require forfeiture of those bonds if the corporation failed to meet the terms of the hotel lease. It seems clear that the previously enumerated restrictions on voting of the shares and the schedule of priorities for disbursement of hotel revenues were for the purpose of insuring that Levitus would not engage in anything other than the ordinary operation of a hotel and thereby to protect the $150,000 in bonds that was taxpayer's only security for payment of the purchase price.

Ordinarily, the right to vote common stock is a benefit accompanying its ownership and the failure to convey such a right is an important factor in determining whether a sale has occurred. See *Kuehner* v. *Commissioner*, 214 F. 2d 437 (C.A. 1, 1954), affirming 20 T.C. 875 (1953). However, under the peculiar facts of this case we cannot say that such a right was a benefit for which Levitus bargained in 1955. The only benefits and burdens with which he was concerned were those which would flow from operation of the hotel, i.e., from the lease. These were not diminished by the restrictions on his right to vote the shares.

This is not to say that the 1955 transaction was the sale of a leasehold interest rather than a sale of the stock. The crucial fact is that Levitus was the owner of record of *all* shares of the lessee corporation and, as such, had the exclusive right to operate the hotel. That being so, he had, for all practical purposes, benefits flowing from ownership of the stock. The facts of the instant case may be contrasted with those in *Kuehner* v. *Commissioner*, *supra*, where only a portion of the outstanding shares were sold. In such a situation effective control over the assets represented by the shares would be dependent on the buyer's right to vote.

Having determined that there was a sale in 1955, the next question is whether the sale was a closed transaction for tax purposes in that year. Petitioner argues for application of the "return of capital" principle first stated in *Burnet* v. *Logan*, 283 U.S. 404 (1931). Applying that principle to the instant facts, petitioner reasons that since the cash received from Levitus in 1955 did not exceed his adjusted basis for the stock and since Levitus' note had no ascertainable market value in 1955, the transaction was not closed in that year. While we agree with the first step in petitioner's reasoning, there is insufficient evidence to support his second step.

The note in question was an unconditional promise to pay $150,000, with interest thereon, between 1955 and 1963. No restrictions were placed on negotiability. Payment of the note was secured by the stock, which represented the lease to operate the hotel and $150,000 in Government bonds.

Petitioner has failed to prove that the note had no ascertainable market value in 1955. He testified only that no portion of the payments was reported as income "because our attorneys told me that would be the right way to handle it under the contract." It is true that the bonds might be forfeited to the lessor if there was a default under the lease, but such a contingency cannot per se authorize a finding that the note had an unascertainable market value. Petitioner offered no evidence regarding the possibility that the contingency would become a reality, other than to state, in giving his reasons for selling, that *prior* to the sale the hotel's income had decreased because of a "colored influx" into the neighborhood. He offered no evidence from persons who ordinarily purchase notes—banks, investment houses, and mortgage companies. Compare *Miller* v. *United States*, 235 F. 2d 553 (C.A. 6, 1956). The case of *Dudley T. Humphrey*, 32 B.T.A. 280 (1935), cited by petitioner, is distinguishable on the grounds that the note involved therein was nonnegotiable and payment thereof was unsecured.

Since petitioner has not proved that the note had an unascertainable market value and that its fair market value was less than face value, we find that the sale was a closed transaction in 1955 [4] and the fair market value of the note in 1955 equaled its face value. *Fihe* v. *Commissioner*, 265 F. 2d 511 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court.

With the disposition of these preliminary problems, we now turn to the parties' contentions regarding characterization of the $22,500 received by petitioner.

Petitioner first contends that the return-of-capital principle requires that the $22,500 be applied against the stock's adjusted basis of $75,000, reducing it to $52,500. However, in his 1960 sale of the stock, he did not treat its adjusted basis as $52,500. His accountant testified that "the basis was arrived at by starting with $75,000 and adding to that basis his expenses of [the 1960] sale." Furthermore, since petitioner failed to prove that Levitus' note had an unascertainable value in 1955, it is part of the "amount realized" within the meaning of section 1001 of the Code. Therefore, the amount realized by petitioner in 1955 exceeded his adjusted basis and the return-of-capital rule is inapplicable.

Petitioner next contends that the $22,500 may be ordinary income to him, but only if he is allowed an ordinary loss on liquidation of the

---

[4] Although respondent in brief states that there is no evidence of the note's fair market value in 1955 and that the transaction was closed in 1958, he does so in contending that there was never a sale of the stock to Levitus. There is nothing in respondent's briefs to indicate the position that he would take on these matters if we found that there was a sale.

corporation in a subsequent year not before the Court. He argues that "consistent" treatment of transactions involving the stock is required under *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952). However, respondent's notice of deficiency and taxpayer's petition relate only to 1958, and we have no jurisdiction over subsequent years. See sec. 6214(b), I.R.C. 1954; *Robert J. Dial*, 24 T.C. 117 (1955).

Having disposed of two of petitioner's alternatives, we now consider whether his remaining alternative—capital gain—is the proper characterization for the $22,500.[5] We note in passing that *Ralph A. Boatman*, 32 T.C. 1188 (1959); *Emily B. Harrison*, 7 T.C. 1 (1946); *Doyle* v. *Commissioner*, 39 B.T.A. 940 (1939), affd. 110 F. 2d 157 (C.A. 2, 1940); *A. M. Johnson*, 32 B.T.A. 156 (1935), and certain Memorandum Opinions of this Court cited by respondent in support of his contention of ordinary income are distinguishable on the ground that no sales occurred therein See *Estate of James M. Shannonhouse*, 21 T.C. 422, 424 (1953).

The base of petitioner's pyramid of authorities is *Arrowsmith* v. *Commissioner, supra.* Involved therein were distributions in liquidation of the corporation from 1937 through 1940. The shareholders reported their gain on the liquidation as capital gain. Arrowsmith, as a former shareholder and transferee of the corporate assets, was required to satisfy in part a judgment entered against the corporation in 1944, and he deducted the amount so paid as an ordinary loss. The Commissioner contended that the loss was capital in nature, and the Supreme Court agreed, on the grounds that (a) if the corporation had paid the judgment in 1940, Arrowsmith's capital gain would have been reduced, (b) the principle of an annual accounting period "is not breached by considering all the 1937–1944 liquidation transaction events in order to classify the nature of the 1944 loss for tax purposes."

The key blocks in petitioner's pyramid are *Harold Wener*, 24 T.C. 529 (1955), affd. 242 F. 2d 938 (C.A. 9, 1957), and *Estate of James M. Shannonhouse, supra.* In *Harold Wener* the taxpayers conveyed their partnership interests to the other partners in February 1947 and received a downpayment therefor in April 1947. The balance of the purchase price was due in 1948 and 1950. They later entered negotiations regarding such balance and, as a result, they received in August 1947 an amount in complete satisfaction of the installments due in 1948 and 1950. The amount received was less than the amount due from the installments, and the taxpayers treated the difference as an ordinary loss. The Commissioner treated the agreements as part and parcel of one transaction and contended that the losses were capital. The Court, rejecting the taxpayers' argument that the February sale

---

[5] The amount of the gain is not in issue.

and the August agreement were two separate transactions, found that (24 T.C. at 532–533)—

prior to the dates the remainder of the purchase price was to become due, there was a renegotiation, adjustment, or revamping of the sale itself both as to price and the terms of payment. * * * there was * * * a renegotiation and revision of the unexecuted provisions of the sales contract itself and the substitution of new provisions therefor.

*Arrowsmith* v. *Commissioner*, *supra*, was cited for the proposition that (24 T.C. at 533)—

The original transaction having been a capital * * * transaction, the losses actually incurred in years after the transaction was regarded as closed were held to be capital losses.

In *Estate of James M. Shannonhouse*, *supra*, the taxpayers sold real estate by warranty deed in 1947 and reported capital gain thereon. In 1948 the purchaser discovered that improvements on the property encroached upon the adjoining lot of another owner. Pursuant to the warranty, the taxpayers made expenditures in 1949 to eliminate the encroachment and deducted same as ordinary loss in that year. The Commissioner relied on *Arrowsmith* v. *Commissioner*, *supra*, in contending that the loss was capital. The Court, relying on *Arrowsmith*, held that the "adjustment under the warranty was a part and parcel of the sale of the property"; that "the liability arose from the transaction wherein the realty was sold"; and that the loss was capital.

The instant case comes within the principle of *Arrowsmith* v. *Commissoner*, *supra*. The facts reveal that this was an "adjustment," *Estate of James M. Shannonhouse*, *supra*, "renegotiation," and "revision," *Harold Wener*, *supra*, of the sale.[6] Although this is the first case in which we have considered a gain rather than a loss, we find nothing in *Arrowsmith* to make the principle enunciated therein inapplicable to a gain.[7] *Estate of James M. Shannonhouse*, *supra* at 424 (dictum); cf. *United States* v. *Adamson*, 161 F. 2d 942, 944 (C.A. 9, 1947). Since there was a bona fide sale of the shares in 1955, the fact that the buyer satisfied the purchase price in part by reconveyance of

---

[6] Since respondent's contention of ordinary income was premised solely on the absence of a sale, he did not brief the question of whether the character of gain or loss resulting from a sale is affected by events subsequent thereto that alter the ultimate amount of such gain or loss. In this regard, we believe the cases of *A. B. Culbertson*, 14 T.C. 1421 (1950); *Mace Osenbach*, 17 T.C. 797, affd. 198 F. 2d 235 (C.A. 4, 1952); *Pat O'Brien*, 25 T.C. 376 (1955); *John W. Chamberlin*, 32 T.C. 1098 (1959), affd. 286 F. 2d 850 (C.A. 7, 1960); and *William A. Tombari*, 35 T.C. 250 (1960), affd. 299 F. 2d 889 (C.A. 9, 1962), are distinguishable from the instant case, for they involve gain from the *collection* of a claim or chose in action, *Chamberlin* v. *Commissioner*, 286 F. 2d 850, 852 (C.A. 7, 1960), not the adjustment or revision of an earlier sale. *Harold Wener*, 24 T.C. 529 (1955), affd. 242 F. 2d 938 (C.A. 9, 1957); *Estate of James M. Shannonhouse*, 21 T.C. 422, 424 (1953).

[7] Justice Jackson, in his dissent, stated (344 U.S. at 11–12): "Suppose that subsequent to liquidation it is found that a corporation has undisclosed claims * * *. The logic of the Court's decision here, * * * would result in a lesser return to the Government than if the recoveries were considered ordinary income. Would it be so clear that this is a capital loss if the shoe were on the other foot?"

the shares does not change the result. See sec. 1.453-6, Income Tax Regs.[8]

To reflect our determination in this opinion and to provide for the agreement of the parties with respect to the management expenses,

*Decision will be entered under Rule 50.*

---

[8] We note that Congress, by Pub. L. 570, 88th Cong., 2d Sess., sec. 2 (Sept. 2, 1964), added sec. 1038 to the Code. The section provides essentially that when a sale of *real property* gives rise to indebtedness to the seller secured by the property, and the seller reacquires the property in satisfaction of the indebtedness, any gain realized thereon by the seller, as determined under the section, will be recognized only to the extent that money and other property received prior to and upon reacquisition exceeds the gain returned as income prior to reacquisition. No loss may be recognized.

Regarding the nature of any such gain, the Senate report states: "Subsection (b) * * * does not change the type of income which results. Thus, * * * gain by dealers in real estate * * * will be ordinary income." S. Rept. No. 1361, 88th Cong., 2d Sess., p. 9 (1964).