Crosby Field v. Commissioner.
Field v. Commissioner
Docket No. 2575-69.
United States Tax Court
T.C. Memo 1971-225; 1971 Tax Ct. Memo LEXIS 106; 30 T.C.M. (CCH) 961; T.C.M. (RIA) 71225; September 7, 1971, Filed. Robert Ash and Carl F. Bauersfeld 1921 Eye St. N.W. Washington D.C. for the petitioner. Patrick E. Whelan, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined a deficiency in the Federal income tax of the petitioner for the taxable year 1966 in the amount of $107,115.93. The petitioner has conceded the disallowance of entertainment expenses in the amount of $344.89. Consequently, the only issue presented for decision is whether the sale of the petitioner's interest in Flakice Corporation was a completed transaction in 1966, resulting in a capital loss of $578,117.29 in that year. 962 Findings of Fact Some of the facts have been stipulated. The stipulation of facts and *107 exhibits attached thereto are incorporated herein by this reference. Crosby Field (hereinafter referred to as the "petitioner") was a resident of Brooklyn, New York at the time of the filing of the petition herein. Petitioner filed his individual income tax return for the year 1966 with the district director of internal revenue at Brooklyn, New York. Petitioner is an inventor and has been a professional engineer since 1952. He holds numerous patents on his inventions, including processes and equipment for the manufacture of small ice. Among the petitioner's inventions are: (a) oxide film lighting arrestor (1912); (b) methods and equipment for the sublimation of certain chemicals; (c) use of mercury vapor for heating and cooling at high temperatures; (d) invention of machines for the manufacture of steel wool, the fabrication of steel wool into pads, and impregnation of soap; (e) invention of methods of continuous production of ice and other products. Petitioner has had more than 130 United States patents and a considerable number of foreign patents issued to him as an inventor. In 1915, while petitioner was chief engineer of Standard Aniline Products, he found that its processes *108 required the consumption of a great deal of ice. The required ice was acquired or manufactured in large blocks and then crushed and subsequently transported to the point of use. This procedure was very wasteful and costly. In order to correct this situation, petitioner realized that it would be necessary to develop some type of ice which was better suited to the purpose of the business. He also determined that apparatus for manufacturing the ice at its point of use was required in order to curb costs. He then started development of ice-making processes and continued until he was called into World War I as a reserve officer. Upon his return from the war, the Chemical Machinery Corporation was formed and continued the development of what is now known as "Flakice." In 1923, petitioner became associated with the Brillo Manufacturing Company but continued his activities in the development of ice-making processes. In 1928, Flakice, a New Jersey corporation, was organized; and, in 1930, Flakice Corporation, a Delaware corporation, was formed. In 1944, the two Flakice corporations were consolidated into Flakice Corporation, the Deleware corporation (hereinafter sometimes referred to as *109 "Flakice"). The business of Flakice was the development and manufacture of processes and equipment for the extremely rapid freezing of water, the development of water containing chemicals, and the development of liquid comestibles. During its existence, approximately 80,000 ice machines were made and sold under Flakice patents. During the years of his association with Flakice, the petitioner purchased stock and loaned money to the corporation in order to carry on and develop the business. In 1966, the petitioner was the president and majority stockholder of Flakice. As of December 30, 1966, petitioner owned 189,505 shares of Flakice stock with a cost basis to him of $79,467.29. On that date, he also held promissory notes of that corporation for funds which he had advanced to the corporation in the amount of $723,650. He had raised this money which he loaned to Flakice by cashing in his life insurance, by mortgaging his home, and by selling his other securities. By 1965, petitioner had lost most of his useful assistants in the company by death or retirement; and, because of his age, he found the burdens of handling all the work of the company too great. In addition, certain customers *110 objected to doing business with the company because of his age. Therefore, petitioner desired to broaden the financial foundation of the company and to bring in some younger executives. To accomplish these purposes, he began to make an effort to sell some of his stock in Flakice in 1965; and, during 1965 and 1966, he contacted 65 prospective buyers for that stock. In a letter dated June 10, 1966, the Irving Trust Company demanded payment of a loan in the amount of $220,000 which it had granted to the petitioner, said loan having been secured by stock of the Purex Corporation held by the petitioner. The letter required that payment be made by 12 p. m. on June 15, 1966. In order to satisfy the loan, petitioner sold most of the Purex stock which he held, realizing a capital gain of $426,996.84. In 1966, petitioner was actively negotiating with Ionics Incorporated (hereinafter referred to as "Ionics") to arrange for an 963 exchange of Ionics' stock for his interest in Flakice, and they had tentatively agreed upon an exchange of stock whereby petitioner was to receive 20,000 shares of stock of Ionics in exchange for his stock in Flakice. Ionics was engaged in the business of development *111 and installation of processes for making fresh water out of salt and had a plant at Waterbury, Massachusetts. After the Irving Trust Company had made demand upon him in June of 1966 for payment of his outstanding loan, petitioner accelerated his efforts to sell his stock in Flakice. In June 1966, petitioner was introduced to Fred W. Shepheard (hereinafter referred to as "Shepheard"). As a prospective purchaser of Flakice, Shepheard made an inspection of the plant facilities of Flakice and on different occasions brought other people with him to go through the plant. He also examined the books and records of Flakice and investigated its general financial condition. Upon completion of his inspection and investigation, Shepheard made an offer to form a corporation which would purchase the petitioner's interest in Flakice for $225,000 with $9,000 as a cash down payment and the remainder in notes. Petitioner did not immediately accept or reject the offer of Shepheard. Rather, he held it under consideration while he continued negotiating with Ionics throughout the remainder of 1966. In December, 1966, Ionics expressed a continuing interest in the acquisition of Flakice, but advised that *112 it would not be able to consummate the transaction before the end of 1966. Since petitioner desired to have any sale consummated before the end of 1966, he decided against a sale of his Flakice interest to Ionics and instead entered into an agreement with Shepheard on December 30, 1966. Shepheard formed a corporation, Jesshep Trading Company (hereinafter referred to as "Jesshep Trading"), in order to limit his liability in the transaction entered into with petitioner. Jesshep Trading had capitalization of $10,000. Its earnings were dependent upon the performance of Flakice, and it had no prospect of earning income for a year or two after December, 1966. Petitioner and Jesshep Trading entered into an agreement dated December 30, 1966 (hereinafter variously referred to as the "agreement," the "December 30, 1966 agreement," or the "agreement of December 30, 1966") whereby petitioner agreed to sell 189,505 shares of common stock of Flakice and notes totaling $723,650 of Flakice for $225,000. The agreement provided in pertinent part as follows: 1. The Purchasers [sic] agrees to buy from the Seller and the Seller agrees to sell to the Purchaser, 189,505 shares of common stock of *113 the Flakice Corporation and notes totaling $723,650 of the Flakice Corporation for the sum of $225,000. 2. That the sum of $225,000 shall be payable as follows: $9,000 on the signing of this agreement and the delivery of stock and notes to the escrow agent hereinafter named; By delivering to the Seller at the signing of this agreement, eighteen notes, as follows, all dated the date of this agreement: * * * 3. The Purchaser shall have the right to prepay any or all of the aforesaid notes at any time upon the payment of all accrued interest. 4. All of the stock, endorsed in blank, with appropriate transfer stamps, and notes of Flakice Corporation shall be deposited with Charles H. Berg, Esq., 164 Montague Street, Brooklyn, New York, as escrow agent, subject to the following terms and conditions: (a) Upon the payment of each note with appropriate interest, the said escrow agent shall deliver to the Purchaser $40,000 of said notes as shown by the principal amount due, without regard for any interest that may be due thereon and also deliver to the Purchaser 10,000 shares of common stock of the Flakice Corporation. On the payment of the last note, all notes and stock still remaining *114 in the hands of the escrow agent shall be delivered to the Purchaser. 5. In the event of the default in payment of any of the notes aforementioned on the due date or any extension granted, in writing, by the Seller to the Purchaser, a copy of which must be delivered to the Escrow Agent, all the remaining stock and notes of the Flakice Corporation remaining in the hands of the Escrow Agent shall be delivered to the Seller. Simultaneously, on December 30, 1966, Jesshep Trading, through Shepheard, and petitioner entered into a letter agreement which was collateral to the petitioner's agreement (hereinafter referred to as the "collateral letter agreement") to sell his Flakice stock and which provided in pertinent part: In consideration of your entering into a purchase agreement, dated today, with the undersigned Jesshep Trading Co., 964 Inc. (the "Purchaser"), and of your selling to the Purchaser the stock and notes described in that agreement all simultaneously with the delivery of this letter agreement, the Purchaser hereby agrees with you as follows: * * * 3. The Purchaser covenants and agrees with you that, until all of the notes of the Purchaser delivered to you, pursuant *115 to the purchase agreement, shall have been fully paid, the Purchaser will not, without your written consent, directly or indirectly: (a) Consolidate with or merge into any corporation or merge any corporation into it or sell, transfer or lease substantially all of its assets or an integral part thereof essential to its business or any of the notes or stock sold to it, pursuant to the purchase agreement. (b) Issue or sell or reclassify or subdivide any of its capital stock or other securities; pay any dividend in cash, stock or other property on its capital stock; or make any other distribution in respect of its capital stock. (c) Vote any of the stock of Flakice Corporation in favor of any dissolution, merger or consolidation of that corporation or in favor of the liquidation, sale, transfer or lease of all of its assets or integral part thereof essential to the conduct of its business. 4. The Purchaser covenants and agrees with you that, until all of the notes of the Purchaser delivered to you pursuant to the purchase agreement shall have been fully paid, the Purchaser will keep complete records and books of account in accordance with generally accepted accounting principles; *116 permit you or your authorized representative to visit and inspect the properties of the Purchaser and to examine and make copies of its books of account and records at reasonable times and intervals; and do all things necessary to preserve its corporate existence and properties and its right and ability to continue its business, and use its best efforts to do or cause to be done all things necessary to preserve the corporate existence and properties of Flakice Corporation and the right and ability of Flakice Corporation to continue its present business. 5. The Seller covenants and agrees that he will endorse his signature to the notes upon the request or demand of the Purchaser. In accordance with the agreement of the parties, all the stock was endorsed in blank with appropriate transfer stamps. The stock and the notes of Flakice were deposited with Charles H. Berg, Esq., as escrow agent. Mr. Berg, as escrow agent, rented a safe deposit box in the Chemical Bank and placed the stock and notes in the safe deposit box. Shepheard did not intend to make payments on the notes issued by Jesshep Trading unless Flakice was making progress and generating income. He did not pay the first *117 note due June 30, 1967, because he was not satisfied with the corporation's progress. Petitioner utilized the $9,000 cash down payment received pursuant to the agreement of December 30, 1966 for the continuing operation of Flakice. This amount was considered by the petitioner to represent a cash advance to Flakice, which was to be repaid by Flakice immediately after January 1, 1967. After the agreement of December 30, 1966, the petitioner continued as president of Flakice in conformity with the desires of Shepheard. Shepheard wanted the petitioner to stay on because of the highly technical nature of the field in which Flakice was engaged in business and because the petitioner was the only individual available with an intimate knowledge of that business. After December 30, 1966, Shepheard frequently went to the Flakice plant. He went over the books with the bookkeeper and examined the income and expenses. He discussed with the sales people the scheduling of contracts and possibilities for future contracts. He also discussed with the plant superintendent the production of machinery that was ordered and the construction of plants in the field. During 1967, the petitioner continued *118 his negotiations with Ionics for the purpose of selling the Flakice stock and notes. He did so on behalf of Shepheard in an attempt to assist Shepheard in the resale of the stock and notes. At the annual stockholders' meeting held on March 29, 1967, Shepheard and his attorney were elected directors of Flakice. The minutes of this meeting listed the names of the registered stockholders as they were carried on the corporate stock ledger. They did not include Shepheard's name or that of Jesshep because the stock purchased from petitioner was held in escrow and had not been presented to the corporation to record the change of ownership. Consequently, the petitioner remained the stockholder of record at the time of 965 this meeting. He presided at the meeting and voted those shares of stock which were registered in his name. In 1967, the business of Flakice continued to deteriorate, and it was unable to meet its obligations. Consequently, on August 23, 1967, Shepheard, in accordance with the bylaws of the corporation, requested that a special meeting of the board of directors be called to determine the feasibility of petitioning for a receiver in bankruptcy for Flakice. As a result *119 of this special meeting, and at Shepheard's direction and upon his order, Flakice went into bankruptcy. Ultimate Findings of Fact The agreement of December 30, 1966 between petitioner and Jesshep Trading providing for the sale by petitioner of the stock and notes of Flakice to Jesshep Trading constituted a completed sale which resulted in a capital loss to the petitioner of $578,117.29 in the taxable year 1966. Opinion During the period herein under consideration, petitioner was president and majority stockholder of Flakice Corporation. As a result of his investments in Flakice over a long period of years, petitioner had a cost basis in the stock and notes of the corporation of $803,117.29. At least $220,000 of this investment was obtained by bank loans secured by the petitioner's stock in the Purex Corporation. When these loans were called in June, 1966, petitioner sold his Purex stock and realized a long-term capital gain of $426,996.84. During 1965 and the first half of 1966, petitioner had been attempting to sell his interest in Flakice. After the bank loans were called in June, 1966, petitioner accelerated his efforts to sell his interest. At the time, petitioner was *120 actively negotiating with Ionics for an exchange of stock; but, when he learned that a transaction with Ionics could not be completed in 1966, he entered into an agreement on December 30, 1966 to sell his Flakice stock and notes to Jesshep Trading for $225,000. As a consequence of this transaction, he claimed a long-term capital loss of $578,117.29 on his 1966 income tax return which offset the gain on his Purex stock. The only issue presented for decision is whether the agreement of December 30, 1966 constituted a completed sale so that the loss resulting from the sale was a long-term capital loss to the petitioner in 1966. It is clear that a loss may be deducted only in the taxable year in which it is sustained. Section 165(a). [1] Furthermore, the year of the loss must be evidenced by a closed and completed transaction and fixed by identifiable events occurring in the taxable year in which the deduction is sought. Income Tax Regs. 1.165-1(d)(1). [2]
*121 The question of when a sale of stock occurs is a factual question, the determination of which is contingent upon the intention of the parties. The crucial consideration is: Was the intention of the parties to the sale of stock in question to vest in the "purchaser" an immediate and absolute title to that stock or to effect a present transfer of the property interest in the stock certificates? MacDonald v. Commissioner, 76 F. 2d 513 (C.A. 2, 1935), affirming 30 B.T.A. 884 (1934). In determining the intention of the parties, it is necessary to examine all facts and circumstances surrounding the transaction being scrutinized as well as the parties' method of dealing. Morco Corporation v. Commissioner, 300 F. 2d 245 (C.A. 2, 1962). Among the "* * * factors to be considered are passage of title, transfer of possession or substantial performance of conditions precedent." Morco Corporation v. Commissioner, supra, at 246. The respondent, placing particular emphasis upon the escrow provisions, argues that the agreement entered into by the *122 petitioner and Jesshep Trading on December 30, 1966 did not represent a closed and completed sale of the petitioner's Flakice stock and notes in the taxable year 1966. Instead, he insists that the agreement was an executory contract to sell in the future. Petitioner argues that the sale was completed at the time of the signing of the agreement on December 30, 1966. In his 966 view, the escrow arrangement was designed merely to serve as security for the payment of the notes drawn by Jesshep. We agree with the petitioner that there was a completed sale in 1966. Under the facts and circumstances of the instant case, it is clear that it was the intention of the parties to have a completed sale of the stock upon the signing of the agreement of December 30, 1966. Hence, the parties intended the December 30, 1966 agreement to be a contract of sale and not an executory contract to sell. In the first instance, the petitioner accepted Shepheard's offer to have Jesshep Trading purchase his interest in Flakice because said offer met with his desire to have a sale of his interest consummated prior to the end of the 1966 calendar year. He eventually decided against an offer from Ionics, *123 a firm with which he had been negotiating prior to the time he had become involved with Shepheard, because it could not arrange to close the sale prior to the end of 1966. This certainly indicates that at the time of the signing of the December 30, 1966 agreement, the petitioner intended to part with all beneficial interest in the stock and notes of Flakice and that he intended the sale of that interest to be final in 1966. The specific terms of the December 30, 1966 agreement and the collateral letter agreement of the same date also support our conclusion that the parties intended a completed sale on December 30, 1966. The agreement signed by the parties on that date provides in part: * * * it is mutually agreed as follows: 1. The Purchasers [sic] agrees to buy from the Seller and the Seller agrees to sell to the Purchaser, 189,505 shares of common stock of the Flakice Corporation and notes totaling $723,650 of the Flakice Corporation for the sum of $225,000. 2. That the sum of $225,000 shall be payable as follows: $9,000 on the signing of this agreement and the delivery of stock and notes to the escrow agent hereinafter named; By delivering to the Seller at the signing *124 of this agreement, eighteen notes, as follows, all dated the date of this agreement: * * * Standing by itself, the "agrees to buy" or "agrees to sell" language of the contract may be indicative of either a contract of sale or a contract to sell; and, therefore, it is not determinative of the nature of the agreement of December 30, 1966. [3] However, when considered together with the language of the agreement relating to payment of the agreed upon consideration, it is clear that by the very terms of the agreement, the parties intended the agreement to be a contract of sale. The terms of payment provided that the consideration of $225,000 was to be payable by the payment of $9,000 on the signing of the agreement and by delivery of eighteen notes at that time. Such language and phraseology indicate *125 that the parties to the agreement contemplated that the petitioner would receive the entire consideration for his interest in Flakice at the time of the signing of the agreement on December 30, 1966. Thus, the notes were intended to constitute payment and not merely evidence of indebtedness, the payment of which was a condition precedent to the passage of title to the Flakice stock and notes from the petitioner to Jesshep Trading. This factor in turn indicates that the parties intended a completed sale on the date of the signing of the agreement. Seletha O. Thompson, 9 B.T.A. 1342 (1928). The collateral letter agreement, which was executed simultaneously with the agreement of December 30, 1966, is also evidence of the intention of the parties as to the time of sale of the Flakice stock and notes. The introductory paragraph of the collateral agreement provides: In consideration of your entering into a purchase agreement, dated today, with the undersigned Jesshep Trading Co., Inc. (the "Purchaser"), and of your selling to the Purchaser the stock and notes described in that agreement all simultaneously with the delivery of this letter agreement, the Purchaser hereby *126 agrees with you as follows: * * * The underlined portion of this paragraph demonstrates that the parties considered the sale to be completed at the time of the 967 signing of the December 30, 1966 agreement and marks that agreement as a contract of sale. The intention of the parties to have a completed sale on December 30, 1966 is also indicated by the facts surrounding Shepheard's relationship to Flakice subsequent to that date. Shepheard requested the petitioner to stay on as president of Flakice because of his expertise in the business. As a consequence of Shepheard's desire to sell the stock and notes of Flakice, the petitioner continued to negotiate with Ionics on Shepheard's behalf for the sale of such stock and notes. It was Shepheard who ordered and forced Flakice into bankruptcy. Furthermore, Shepheard took an active role in the conduct of the Flakice business after the signing of the agreement. He went over the books with the bookkeeper and examined the income and expenses. He discussed with the sales staff the scheduling of contracts and possibilities for future contracts. He also discussed with the plant superintendent the production of machinery that was ordered *127 and the construction of plants in the field. The circumstances in the above two paragraphs evidence the fact that after the signing of the agreement, the parties considered active overall control of Flakice, if not the day-to-day control, to be in the hands of Shepheard. Such control subsequent to the signing of the agreement entered on December 30, 1966 indicates that there was a completed transaction at the time of the execution of that agreement. Alvin B. Lowe, 44 T.C. 363 (1965). On the basis of these considerations, and after a careful analysis of all the facts and circumstances present in this case, we find and hold that the agreement of December 30, 1966 was intended to constitute and did constitute a contract of sale and not an executory contract to sell. These same considerations would also lead us to conclude that the parties intended the escrow arrangement solely as a security device for the protection of the petitioner. Nevertheless, the respondent insists that the terms of the escrow arrangement in this case require us to find that the parties did not intend a completed sale at the time of the signing of the 1966 agreement. The respondent specifically *128 relies on those provisions of the escrow arrangement which provide for delivery to the purchaser of a certain portion of the Flakice stock and notes held in escrow upon payment of each semiannual note and which specify that upon the default of the purchaser on any of the semiannual notes, the escrow agent is to return to the petitioner all Flakice stock and notes remaining in his custody. Citing Solomon Silberblatt, 28 B.T.A. 73 (1933), the respondent concludes that these provisions indicate that payment of each of the semiannual notes of Jesshep Trading was a condition precedent to the passage of title to those portions of the Flakice stock and notes which were to be delivered upon the payment of each of said notes, and that, therefore, there was not a completed sale in 1966. As an initial matter, the existence of an escrow or escrow-type arrangement in an agreement is only one of the factors to be considered in determining when the parties intended a sale to be completed, and such an arrangement does not negate a sale where it is otherwise determined that it was the intention *129 of the parties to effect a sale. Alfred N. Hoffman, 47 T.C. 218 (1966), affirmed 391 F. 2d 930 (C.A. 5, 1968); Alvin B. Lowe, supra; Jacob Carp., supraSeletha O. Thompson, supra; and John W. Sherwood, 8 B.T.A. 103 (1927). After a careful consideration of all the facts and circumstances of the instant case, including the existence of the escrow arrangement, we have determined that the parties herein intended that a completed sale be effected in 1966. The Silberblatt case does not require a different conclusion for that case is clearly distinguishable from the instant case. In the Silberblatt case, this Court found that the contract of sale therein involved made it clear that the notes given by the purchaser were "neither given nor received as discharge of the unpaid balance." In the instant case, we have found that the contract of sale and the collateral letter agreement clearly indicated that the notes given by the purchaser were given and received in discharge of the unpaid balance. The Silberblatt case is also distinguishable from the instant case on another ground. In Silberblatt, there was *130 no evidence to indicate that the purchaser exercised any control or in any way participated in the affairs of the business subsequent to the sale. In the case now before this Court, such evidence is in abundance; and we have found it to be indicative of the intention of the parties to effect a completed sale at the time of the signing of the agreement of December 30, 1966. 968 Citing Kuehner v. Commissioner, 214 F. 2d 437 (C.A. 1, 1954), affirming 20 T.C. 875 (1953), the respondent argues that the right to vote stock is generally a benefit which attaches to its ownership, and that the failure to convey such a right is an important factor weighing against a determination that a sale has occurred. The respondent points out that at the time of the annual stockholders' meeting in 1967, the petitioner remained the record owner of the Flakice stock which had been the subject of the December 30, 1966 agreement. He also points out that the petitioner voted those shares at that annual stockholders' meeting. On this basis, he concludes that there was not a completed sale of the Flakice stock and notes on December 30, 1966. While we agree with the general *131 principle established by the Kuehner case, we cannot sustain the respondent's application of that principle to the facts now before us. In this case, the petitioner was acting at the direction of Shepheard. Since the stock had not been formally transferred on the books of the corporation, the petitioner was the only person qualified of record to vote the stock. He voted the stock as he was directed. This is not uncommon. Stock belonging to others is frequently registered in the name of nominees, such as brokerage firms and financial institutions, and voted in accordance with directions from the real owners. Furthermore, Shepheard was elected to the board of directors of Flakice at the stockholders' meeting. He had already begun to exercise his authority as controlling stockholder in that he requested that the petitioner stay on as president of Flakice and he took an active role in the conduct of the Flakice business after the signing of the agreement. It was also Shepheard who ultimately ordered and directed that Flakice be placed in bankruptcy. It is thus clear that Shepheard had practical ownership and control of Flakice, even though the stock was still registered in the name of *132 the petitioner. Not only did Shepheard clearly indicate that he regarded himself as the owner of the stock, but the petitioner accepted this fact. Thus the actions of the parties were wholly consistent with the completed sale having taken place at the time of the agreement of December 30, 1966. Alvin B. Lowe, supra. The respondent also argues that the restrictions which the collateral letter agreement placed upon Jesshep Trading with respect to its stock and the stock of Flakice, together with the other agreements and warranties made in that agreement by the purchaser (Jesshep) in favor of the seller (petitioner), indicate that the parties did not intend a completed sale until all of the Jesshep notes were paid. Again, we must disagree with the respondent. The provisions of the collateral letter agreement relating to respondent's argument provide: 3. The Purchaser covenants and agrees with you that, until all of the notes of the Purchaser delivered to you, pursuant to the purchase agreement, shall have been fully paid, the Purchaser will not, without your written consent, directly or indirectly: (a) Consolidate with or merge into any corporation or merge any *133 corporation into it or sell, transfer or lease substantially all of its assets or an integral part thereof essential to the business or any of the notes or stock sold to it, pursuant to the purchase agreement. (b) Issue or sell or reclassify or subdivide any of its capital stock or other securities; pay any dividend in cash, stock or other property on its capital stock; or make any other distribution in respect of its capital stock. (c) Vote any of the stock of Flakice Corporation in favor of any dissolution, merger or consolidation of that corporation, or in favor of the liquidation, sale, transfer or lease of all of its assets or integral part thereof essential to the conduct of its business. 4. The Purchaser covenants and agrees with you that, until all of the notes of the Purchaser delivered to you pursuant to the purchase agreement shall have been fully paid, the Purchaser will keep complete records and books of account in accordance with generally accepted accounting principles; permit you or your authorized representative to visit and inspect the properties of the Purchaser and to examine and make copies of its books of account and records at reasonable times and intervals; *134 and do all things necessary to preserve its corporate existence and properties and its right and ability to continue its business, and use its best efforts to do or cause to be done all things necessary to preserve the corporate existence and properties of Flakice Corporation and the right and ability of Flakice Corporation to continue its present business. 969 With respect to the above provisions of the collateral letter agreement, we consider the restrictions on the purchaser's voting of the Flakice stock, the restrictions on the purchaser's conduct of its own business, and the covenants made by the purchaser in the fourth numbered paragraph to be a form of security for the petitioner. It seems clear that the restrictions placed upon the purchaser with respect to its own stock and the restrictions placed upon its voting of the Flakice stock, together with the covenants of the fourth numbered paragraph, were for the purpose of insuring that the purchaser (Jesshep Trading) would devote its entire energies to the conduct of the Flakice business without impairing its own ability to so conduct that business, and to insure that it would engage only in the normal operation of the *135 Flakice business. Cf. Alvin B. Lowe, supra.Thus, these restrictions and covenants were intended to provide for the continued operation of the Flakice business through the best efforts of the purchaser; and, in view of the fact that the expected profitability of Flakice was to be the basis for the payment of the purchase price, such continued operation was the petitioner's only security for the payment of said purchase price. Furthermore, the restrictions and covenants in the collateral letter agreement are also strong indications that the parties intended that a completed sale of the Flakice stock and notes was to be consummated on December 30, 1966. Such restrictions and covenants demonstrate that the parties considered control of Flakice to have shifted to the purchaser (Jesshep Trading) on the date of the agreement for such restrictions and covenants with respect to the purchaser's control would not have otherwise been necessary. As previously stated and emphasized, this shifting of control is indicative of the intention of the parties to effect a completed sale at the time of the signing of the agreement of December 30, 1966 and the collateral letter agreement. *136 Alvin B. Lowe, supra. The respondent goes on to argue that the "bootstrap" nature of the acquisition of Flakice by Jesshep Trading requires us to conclude that there was not a completed sale in 1966. The respondent points out that Jesshep Trading was organized with a capitalization of only $10,000 and that after making the down payment of $9,000 on the Flakice stock and notes, its remaining capital was only $1,000 as contrasted to its liability of $216,000 on the notes it gave at the signing of the agreement of December 30, 1966. With this factor in mind, the respondent correctly assumes that because Jesshep Trading had been organized solely for the purpose of limiting Shepheard's liability and had no actual business of its own, its ability to earn income and to pay off the notes was entirely dependent on the profitability of Flakice. On this basis, the respondent concludes that since the parties were aware of these factors which rendered Jesshep incapable of making payment at the time of agreement, they did not intend the sale to be completed until full payment of the notes had been made. The respondent's emphasis on the "bootstrap" aspect of this transaction is *137 misplaced. In the first instance, the establishment by the parties of a "bootstrap" acquisition cannot negate a sale which is otherwise complete, Commissioner v. Brown, 380 U.S. 563 (1965); and we have found such a completed sale in this case. Furthermore, in the circumstances of this case, the "bootstrap" feature of the transaction indicates that the parties did intend the sale to be consummated at the time of the agreement of December 30, 1966. As the respondent has so aptly pointed out, this feature indicates that the parties contemplated that Jesshep Trading would use the future earnings of Flakice to pay the notes held by the petitioner. However, the very fact that the parties had this expectation as to the use of the funds was necessarily premised on a conclusion by the parties that Jesshep Trading, the purchaser, had control over the disposition of the earnings of Flakice after the agreement of December 30, 1966. Such control over the fruits of the enterprise by the purchaser indicates that the parties intended a completed sale of the Flakice stock and notes at the time *138 they entered that agreement on December 30, 1966. Alfred N. Hoffman, supra; and Alvin B. Lowe, supra.
Decision will be entered under Rule 50. 970 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. Section 165(a) provides: (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
2. Reg. 1.165-1(d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a)↩ only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. * * *
3. In Jacob Carp, 31 B.T.A. 541 (1934), this Court found a completed sale where the "agrees to buy" and "agrees to sell" language was present in the contract involved. However, in George R. Myers, 42 B.T.A. 640↩ (1940), such language in a contract was utilized by this Court to bear out its conclusion that the parties intended an executory contract to sell.